THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF
   NEW YORK, Appellant, *v.* THE TENTH NATIONAL BANK,
   Respondent.

The "New York Court-House," the construction of which was inaugurated
   by an appropriation in 1860 (Chap. 509, Laws of 1860), was a county
   building, and the commissioners appointed in pursuance of the act of
   1870 (§ 11, chap. 382, Laws of 1870) to complete the construction were
   county commissioners.
The provision of the act of 1872 (Chap. 9, Laws of 1872), authorizing and
   directing the comptroller of the city of New York to pay back to the
   various banks, etc., of the city all moneys which had been advanced by
   them "for the use of any of the departments or commissioners of the
   city or county" was a valid exercise of legislative power and made
   such advances binding obligations on the city.
After commissioners were appointed under said act of 1870 they appointed
   a treasurer, who applied to defendant to make advances to and for the
   use of the commissioners.  This, after its president had consulted with
   the city comptroller and mayor and had been advised by them that it
   was proper and right, it agreed to, and did make advances upon checks
   drawn by said treasurer   No other advances were made to any county
   commissioners and no other claim for advances to the county was pre-
   sented under the act.   *Held*, that, although the commissioners were not
   authorized to take the advances on the credit of the county, and the

defendant was chargeable with notice thereof, they were ratified by the act of 1872 and the city was thereby made liable therefor

All of the checks were drawn ostensibly to pay bills and expenses incurred by the commissioners in the construction of the court-house.   It appeared that a fraudulent conspiracy had been entered into by and between the treasurer, another of the commissioners, the comptroller and others, by which certain of the bills were to be raised above their true amount and the excess was to be divided between the conspirators.   A portion of the advances made by defendant were upon checks in payment of bills so raised.   This conspiracy was unknown to the other commissioners, and defendant's president, who was the sole agent and representative of the bank, in making the advances had no knowledge or notice of the conspiracy or the misappropriation.   It was customary for the city banks to make advances to the various departments and commissioners in anticipation of appropriations.   *Held,* the fact that part of the advances were so misappropriated did not deprive defendant of the right to recover the same.

It appeared that three of the conspirators were directors of the defendant.   Neither of them were present at any meeting of the board of directors when action was taken in reference to the advances, and in no way acted for the bank in the transactions.   *Held,* that defendant was not chargeable with notice of the fraud or precluded from claiming the benefit of good faith on its part; that, under the circumstances, knowledge which the directors who were engaged in the conspiracy had could not be attributed to it.

As municipal corporations are creatures of the state and exist and act in subordination of its sovereign power, the legislature may determine what moneys they may raise and expend and what taxation for municipal purposes may be imposed; and so, it may compel such a corporation to pay a claim which has some meritorious basis to rest on.

(Argued October 24, 1888; decided November 27, 1888.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made May 8, 1888, which affirmed a judgment in favor of plaintiff entered upon a decision of the court on trial without a jury.

The complaint alleges that the defendant was duly designated as one of the depositories of the moneys of the city and county of New York, and that between the 1st day of December, 1871, and the 31st day of May, 1873, large sums of such moneys were deposited with it upon which it agreed to allow interest at the rate of four per cent upon daily balances; and that there

was due it on account of such interest the sum of $250,000, for which judgment is demanded.

The defendant, in its answer, besides making various material denials, sets up as a counter-claim that, between the 29th day of April, 1871, and the 2d day of September, 1872, it had advanced to the commissioners of the new county court-house of New York, for the use of such commissioners, the large sums of money specified; that, by chapters 9 and 29 of the Laws of 1872, the comptroller of the city of New York, who was then the fiscal officer of the county of New York, was authorized and required to pay back to the defendant the moneys so advanced; that such commissioners were commissioners of the county of New York, and by chapter 304 of the Laws of 1874 the debt to it for the moneys so advanced was made a charge against and a liability of the city; that there is due to it for the moneys so advanced the sum of $242,579.97, with interest from February 1, 1872, for which judgment is demanded against the plaintiff. The plaintiff replied to the counter-claim alleging various defenses thereto.

The issues thus joined were brought to trial at a circuit before a judge presiding without a jury. The judge found that the defendant was indebted to the plaintiff on account of the interest in the sum of $66,301.36, and that there was due to the defendant upon its counter-claim, after deducting the debt for the interest, the sum of $358,849.23, for which sum he ordered judgment in favor of the defendant.

Other facts, so far as material, appear in the opinion.

*John H. Strahan* and *Simon Sterne* for appellant. The defendant was not only chargeable with knowledge of the limitation of the authority of the court-house commissioners, but made its loans in disregard of this notice, and did so in direct violation of the law under which the claim for advances was sought to be made. (*Hodges* v. *City of Buffalo*, 2 Denio, 110, 112; *Appleby* v. *Mayor, etc.*, 15 How. 428; *Donovan* v. *Mayor, etc.*, 33 N. Y. 291; *Dannat* v. *Mayor, etc.*, 66 id. 587; *People ex rel. Bennett* v. *Jackson*, 85 id. 541; *Miller*

v. *Mayor, etc.,* 76 id. 151.)     The claims of the Tenth
National Bank for overdrafts of Ingersoll, the court-house
commissioner, were not legalized or ratified by chapters 9
and 29 of the Laws of 1872.     (Vattel's Rule, Potter's
Dwarris on Statutes, 128, 129 ; Endlich on Interpretation of
Statrtes, §§ 76–80 ; *Miller* v. *Mayor, etc.,* 76 N. Y. 151 ;
Laws of 1860, chap. 10 ; Laws of 1870, chap. 137 ; *Maxi-
millian* v. *Mayor, etc.,* 62 N. Y. 160 ; *Dash* v. *Van Kleeck,*
7 Johns. 477 ; *Wood* v. *Oakley,* 11 Paige, 400 ; Sedgwick
on Construction of Statutes [2d ed.] 167 ; *Neff's Appeal,*
21 Pa. 243 ; *Cox* v. *Mayor, etc.,* 103 N. Y. 524.)     It is
clearly incompetent for the legislature to do that by subse-
quent ratification which it could not originally have authorized.
(*Loan Assn.* v. *City of Topeka,* 20 Wall. 655 ; *Cox* v. *Mayor,
etc.,* 103 N. Y. 524, 526 ; *Ehrgott* v. *Mayor, etc.,* 96 id. 264 ;
*Maximillian* v. *Mayor, etc.,* 2 Hun, 263 ; 62 N. Y. 160 ;
*Nelson* v. *Mayor, etc.,* 63 id. 536 ; *Dannat* v. *Mayor, etc.,*
66 id. 585 ; *Miller* v. *Mayor, etc.,* 76 id. 151 ; 5 Johns.
175 ; 3 Hill, 139 ; 3 N. Y. 9 ; *Wardell* v. *R. R. Co.,* 103
U. S. 651 ; *Thomas* v. *R. R. Co.,* 109 id. 523 ; *Munson* v.
*S. G. & O. R. R. Co.,* 103 N. Y. 73.)     It is not constitu-
tionally competent for the legislature to create against the
municipality a claim as well as a remedy.     (Cooley on Const.
Lim. [5th ed.] 455, 469, 470 ; *Guilford* v. *Suprs. of Che-
nango,* 13 N. Y. 143 ; *Brewster* v. *Syracuse,* 19 id. 116 ;
*Thomas* v. *Leland,* 24 Wend. 65 ; *Hasbrook* v. *Milwaukee,*
13 Wis. 37 ; *Silliman* v. *Marshall,* 60 Ill. 218 ; *Peop'e* v.
*Harbes,* 37 Barb. 440 ; *People* v. *Otis,* 24 Hun, 519 ; *People*
v. *Batchellor,* 53 N. Y. 128 ; *People* v. *Loew,* 102 id. 475.)
Leaving Ingersoll out of the question, Connolly's knowl-
edge was the bank's knowledge, even without refer-
ence to the meeting of the bank directors in the board
room, as he was active in the very transaction which is
here under consideration.     (*Holden* v. *N. Y. & E. Bk.,*
72 N. Y. 286 ; *Craig* v. *Hadley,* 99 id. 131 ; 86 id. 163 ;
96 id. 559 ; 26 Hun, 630 ; 31 id. 109 ; 32 id. 111, 371 ;

*Bank of U. S.* v. *Davis*, 2 Hill, 451; *Fulton Bank of New York* v. *Coal Co.*, 4 Paige, 127; *Citizens' Savings Bank* v. *Blakesley*, 42 Ohio St. 645.) When a portion of a consideration is valid and the other *malum in se*, the failure is entire. The maxim *ex turpi contractu non oritur actio* applies. (*Steinfield* v. *Levy*, 16 Abb. Pr. [N. S.] 27; *Gray* v. *Hook*, 4 N. Y. 449; *Pepper* v. *Haight*, 20 Barb. 437, 438; *Woodworth* v. *Bennett*, 43 N. Y. 273.) Knowledge of the fraudulent intent to divert the moneys to be drawn on the part of a single director of the Tenth National Bank, who acted in any way in relation to these advances, is the knowledge of the bank, and is not simply constructive, but actual notice. (Wade on Law of Notice, §§ 681–683; *Bank of U. S.* v. *Davis*, 2 Hill, 451; *Nat. Security Bk.* v. *Cushman*, 121 Mass. 490; *Clerks' Savings Bank* v. *Thomas*, Mo. App. 267–282; *Dana* v. *Bank of United States*, 5 W. & S. 247; 2 Pomeroy's Eq. Jur. § 667; *First National Bank* v. *Drake*, 29 Kans. 81; *Bank of New Milford* v. *Town of New Milford*, 36 Conn. 93.) The legal presumption is that the members of the board of directors of the bank regularly attended the meetings which it was their duty to attend. (*Shilkuecht* v. *Eastburn's Heirs*, 2 Gill. & J. [Md.] 114; *In re Mason*, 4 Edw. Ch. 418; *Martin* v. *Webb*, 110 U. S. 7; *Knick. L. Ins. Co.* v. *Pendleton*, 115 id. 339; *Bank of America* v. *McNeil*, 10 Bush [Ky.] 54; *Nat. Security Bank* v. *Cushman*, 121 Mass. 490.) When a paper comes into the possession of a party, who does not produce it, or account for its loss, the most favorable intendment, as to its contents, will be made for the benefit of the other party. (*Livingstone* v. *Newkirk*, 3 Johns. Ch. 312; *Hudson* v. *Arundel*, Hob. 109; *S. C.*, 2 P. Wms. 748; *Dalston* v. *Coatsworth*, 1 id. 731; 1 Ves. 235; *Life & Fire Ins. Co.* v. *Mec. Fire Ins. Co.*, 7 Wend. 31; *Barber* v. *Lyon*, 22 Barb. 622, 625.) If the legislature intended, by chapters 9 and 29 of the Laws of 1872, or either of them, to legalize this counter-claim of the Tenth National Bank against the city, tainted as it was in great part by fraud, and wholly illegal, and which is the basis of the judgment recovered herein,

such legislation is without constitutional authority, and in violation of the Constitution of the United States and of the state of New York. (*Loan Association* v. *City of Topeka*, 20 Wall. 655.)

*Thomas Allison* for respondent.    Upon the facts as found by the court below the defendant was entitled to recover on its counter-claim. (*People ex rel. Tenth Nat. Bk.* v. *Green*, 5 N. Y. Sup. Ct. [T. & C.] 376, 378.)    As the fact of the advances, having been made by the bank to or for the use of the commissioners, was denied, a peremptory *mandamus* could not be granted until that issue was regularly tried and determined, and this could not be done by affidavits. (*People ex rel. Tenth Nat. Bk.* v *Green*, 5 N. Y. Sup. Ct. [T. & C.] 376, 378 ; *Same* v. *Bd. of Apportionment*, id. 382.)    In view of the act of 1874, consolidating the city and county, the remedy by *mandamus* for county claims no longer existed, the bank's remedy, if it had a valid claim, was by an action against the city for the advances. (*People ex rel. Tenth Nat. Bk.* v. *Bd. of Apportionment*, 64 N. Y. 627, 628.)    To such an action the non-issuance of the bonds would be no defense. (*Quinn* v. *Mayor, etc.*, 63 Barb. 595, 600 ; 53 N. Y. 627.) The test of whether officers or commissioners, or other official bodies, are state, city or county officers or bodies does not depend upon the method of their appointment, nor on the fact that their duties are prescribed by statute, but depends upon the character and result of the duties to be performed by them, and upon the question at whose expense are those duties to be performed. ( *Wood* v. *Mayor, etc.*, 7 Hun, 164 ; *People ex rel. Ryan* v. *Civil Service Boards*, 41 id. 287, 298 ; *Walsh* v. *Mayor, etc.*, Id. 299 ; 1 N. Y. 401 ; *Erghott* v. *Mayor, etc.*, 96 id. 264 ; *People* v. *Stout*, 23 Barb. 349, 350, 352.)    The new court house commissioners were commissioners of the county, because they were appointed to discharge a duty primarily resting upon the county, and by which the county was benefited, and the expense of which was to be defrayed by the county. (Code of Pro. §§ 15, 28,

51; Laws of 1853, chap. 529; Laws of 1860, chap. 509; Laws of 1861, chaps. 161, 240; Laws of 1862, chap. 167; Laws of 1863, chap. 108, § 1; Laws of 1864, chap. 242; Laws of 1865, chap. 605; Laws of 1866, chap. 837; Laws of 1867, chap. 806; Laws of 1868, chap. 854; Laws of 1869, chap. 875, § 4; Laws of 1870, chap. 382, § 11; Laws of 1871, chap. 583, § 4.) The money having been borrowed by the commissioners without authority, and advanced by the bank for their purposes and use, the legislature had power to supply the want of authority and ratify the unauthorized act, and give it the same force and effect as if such authority had been given originally. (*People* v. *Mayor, etc.*, 4 Comst. 419; *Brewster* v. *City of Syracuse*, 19 N. Y. 116; *Town of Guilford* v. *Supervisors*, 13 id. 143; *People* v. *Mitchell*, 35 id. 551; *Darlington* v. *Mayor, etc.*, 31 id. 164; *Brown* v. *Mayor, etc.*, 63 id. 239, 244; *Nelson* v. *Mayor, etc.*, Id. 535; Dillon's Munic. Corp. [3d ed.] §§ 79, 80, 814; Cooley on Const. Lim. [13th ed.] 461, 467, 468, 473; *Syracuse Bk.* v. *Davis*, 16 Barb. 188.) The fact that the advances made were in violation of the national banking act has nothing to do with the question of legislative ratification. That fact did not in any way impair the right of defendant to recover the money advanced. (*Gold Mining Co.* v. *Nat. Bk.*, 96 U. S. 640; *Duncomb* v. *N. Y., H. & N. R. R. Co.*, 84 N. Y. 190, 205.) The defendant bank is not chargeable with any notice or knowledge had by any of its officers or directors, who did not in fact act in its behalf or as its agents in the making of the advances. (*Bank of U. S.* v. *Davis*, 2 Hill, 451; *President, etc.* v. *Cornen*, 37 N. Y. 320; *Holden* v. *N. Y. & E. Bk.*, 72 id. 291; *At. Bk.* v. *Savery*, 82 id. 293; *Cragie* v. *Hadley*, 99 id. 131.)

Earl, J. The learned and exhaustive argument by the counsel for the city has failed to convince us that the judgment appealed from is erroneous.

The construction of the New York court-house seems to have been inaugurated by an appropriation, in the act

chapter 509 of the Laws of 1860, of $100,000 "for the purpose of erecting suitable court rooms for the accommodation of the several courts of the county." By the act chapter 161 of the Laws of 1861, the board of supervisors of the county of New York was authorized and empowered to acquire and take for the purposes of building a court-house therein, such land in the city and county of New York as they might deem necessary for the purpose; and provision was made for taking and acquiring the land by condemnation proceedings, and for raising money on the credit of the county to pay for the same. By chapter 24 of the same year and chapter 167 of 1862, 108 of 1863, 242 of 1864, 605 of 1865, 837 of 1866, 806 of 1867, 854 of 1868, and 875 of 1869, the board of supervisors was authorized to raise money for the construction and completion of the court-house. Under the act of 1861, land was acquired from the city upon which to erect the court-house, and during all the years named the construction thereof was carried on by the board of supervisors through agencies employed by it. The bills for work and materials employed in the construction were audited by the board of supervisors like other county bills, and were paid by the comptroller of the city. Then the system for the construction of the court-house was changed by section 11 of the act, chapter 382, of the Laws of 1870, which authorized and empowered the mayor of the city to appoint four commissioners for the final completion of the "new county court-house," and provided that upon the appointment of the commissioners all power of the board of supervisors over the erection of the court-house should cease; that the commissioners should have the power to expend and should complete the court-house for a sum not exceeding $600,000, which amount the comptroller was authorized and directed to raise on the stock of the county, to be designated the "New York County Court-House stock No. 4;" that the money so raised should be paid by the comptroller on vouchers approved by the commissioners. Under that act, on the 1st day of December, 1870, the mayor appointed James H. Ingersoll,

Michael Norton, Thomas Coman and John J. Welsh the commissioners, who continued in office and served as such until some time after 1872.

By section 7 of the act chapter 583 of the Laws of 1871, the sum of $750,000 was appropriated for the completion of the "New York County Court-House," to be expended under the direction and supervision of the court-house commissioners; and the comptroller was commanded on the requisition of the commissioners to pay over to their credit such sum or sums as they might from time to time deem necessary for such purpose; and the comptroller was authorized and directed to raise the amount appropriated on the stock of the county of New York. In the same act it was provided that no bonds or stocks of the city or county of New York, except those authorized to be issued by the direction of the commissioners of the sinking fund, and revenue bonds issued in anticipation of the taxes of the current year, should be thereafter issued except by the concurrence and authority of all the persons composing the board of apportionment, consisting of the mayor, comptroller, the commissioner of public works and the president of the department of parks, who should be present at a meeting called by the chairman of the board for that purpose on three days notice.

From this review of the statutes it is clear that the court-house was a county building, built for county purposes, at the county expense, upon county real estate actually purchased of the city, and that when built it belonged to the county. The commissioners appointed to build it were county commissioners, engaged in disbursing county moneys, and discharging functions devolved upon them as county officials or agents. It matters not that they were appointed by the mayor of the city. It was for the legislature to determine how they should be appointed. It could have named them in some act, or could have devolved their appointment upon the board of supervisors, or the sheriff, or some other local officer. Their character as county commissioners depended, not upon the source of their appointment, but upon the nature of their duties

and powers, and of the work they were required to perform. That they were county commissioners has been several times decided by the courts in New York, in unreported decisions, and the following cases tend strongly to the same conclusion : *People* v. *Stout* (23 Barb. 349); *Wood* v. *Mayor, etc.* (7 Hun, 164); *People ex rel. Ryan* v. *The Civil Service Board* (41 Hun, 287); *Ehrgott* v. *Mayor, etc.* (96 N. Y. 264); *Walsh* v. *Mayor, etc.* (107 N. Y. 220).

It is conceded, and was so found by the trial judge, that the commissioners had no power or authority to borrow any money on behalf or on the credit of the county, and that they did not, and could not, bind the county for the advances made to them by the defendant; and if there had been no further legislation than that already referred to, the city, succeeding to the liabilities of the county, would have been under no legal liability to the defendant for the claim made by it.

It is important, before going further, to inquire whether the defendant made these advances in good faith, and, to answer this inquiry, a few facts must first be stated. After the commissioners were appointed, Ingersoll was chosen their treasurer, and he was such from the date of his appointment until some time subsequent to December 31, 1872. The bank received formal written notice of his appointment as treasurer, and that his would be the only signature in dealings of the commissioners with the bank. In the month of April, 1871, Ingersoll, as treasurer, applied to the defendant to make advances to and for the use of the commissioners, and to act as a bank of deposit for them, and it agreed to do so. Before, however, it made such agreement, its president called upon both the comptroller and the mayor of the city and they each informed him that it was proper, safe and right for him to take the account of the commissioners and make the advances. Thereafter, before the 2d day of September, 1871, the defendant advanced and paid to and for the use of the commissioners, upon checks drawn upon it by Ingersoll, as treasurer, and indorsed by the payees therein named, the sum of $442,579.97.

The only money deposited to the credit of the commissioners was the sum of $200,000, deposited by the comptroller on the 7th day of July, 1871, in compliance with a requisition made by the commissioners upon him, and out of an appropriation authorized by the board of apportionment. All the checks were drawn to pay bills and expenses ostensibly made by the commissioners in the construction of the court-house, and all the money drawn upon the checks was actually applied to pay such bills and expenses, except the sum of $45,000, and that was fraudulently misappropriated under the following circumstances : A fraudulent conspiracy had been entered into by Ingersoll, William M. Tweed, Richard B. Connolly, then the comptroller, and others, by which certain of the bills were to be raised forty per cent above their true amount, and this excess was to be divided between the conspirators for their own private use. This conspiracy was unknown to the other commissioners, and there is no proof that it was known to the mayor of the city. All the dealings of the bank with Ingersoll as treasurer were conducted through its president, William M. Bliss, and he was the sole agent and representative of the bank. There was nothing in the form of the checks drawn by Ingersoll to give him any notice of the conspiracy or fraud, and he had no knowledge whatever of the misappropriation of any of the money drawn. There was no proof whatever that he acted in bad faith in making the advances upon the checks. He ought to have known that the commissioners had no authority to take these advances upon the credit of the county. But the knowledge which the law imputes to him of their want of authority has no bearing whatever upon the question of his good faith. He used due diligence. He consulted the comptroller and the mayor, who was also a lawyer, and was assured that the arrangement which the commissioners proposed to make with him was right and proper; and it was not an unusual arrangement, as the city banks were much in the custom of advancing moneys to the various departments and commissions of the city in anticipation of appropriations to be made.

But it is claimed that knowledge of the conspiracy and fraud must be imputed to the bank, because three of the conspirators, Ingersoll, Tweed and Connolly were directors of the bank, and hence that the bank could not claim the benefit of good faith. But none of these directors represented the bank in these transactions and in no way acted for the bank in them. Connolly was consulted as comptroller, and Ingersoll acted for the commissioners. Neither of them was present at any meeting of the directors when any action was taken in reference to the advances. The sole agent and representative of the bank was Bliss, its president, and he was entirely innocent of any wrong. The knowledge these conspirators had while engaged in their fraud for their own benefit could not, therefore, be attributed to the bank; and to this effect are all the decisions. (*Bank of U. S.* v. *Davis*, 2 Hill, 451; *President, etc.*, v. *Cornen*, 37 N. Y. 320; *Holden* v. *N. Y. & Erie Bk.*, 72 id. 291; *Atlantic Bank* v. *Savery*, 82 id. 291; *Cragie* v. *Hadley*, 99 id. 131; *Custer* v. *Tompkins Co. Bk.*, 9 Penn. St. 27; *President, etc., Washington Bank* v. *Lewis*, 22 Pick. 24; *Farmers and Citizens' Bank* v. *Payne*, 25 Conn. 444.)

The question now remains whether these advances, made by the defendant, were subsequently ratified by competent legislative action. Before September 1871, the appropriations made for the various city departments and commissions had been exhausted, and in that month and October and November of the same year certain banks, trust companies and insurance companies advanced to the comptroller of the city or the departments and commissions large sums of money, for the purpose of paying the expenditures of such departments and commissions during those months and the month of December, and they took as security for the moneys so advanced assignments of the claims to pay which the moneys were borrowed. These moneys were advanced without authority of law to meet an emergency, with the expectation that subsequent legislative action would ratify the advances. On the 30th day of January, 1872, in section 2 of the act chapter 9 of the laws

of that year, it was provided that the comptroller, out of the proceeds of bonds authorized to be issued by that act, should be authorized and required to pay back to the " various banks, insurance and trust companies of the city of New York all moneys which have been advanced by said banks, insurance and trust companies, or any of them prior to the 31st day of December, 1871, to or for the use of any of the departments or commissions of the city or county of New York." These advances made by the defendant are plainly embraced within the language of this act. They were advances made by a city bank to and for the use of county commissioners. The claim for the advances was before the passage of the act as well known to the comptroller as the claims of the other corporations which had advanced moneys. We may assume that the act was drawn under the supervision, or at the instigation of the comptroller, the financial officer of the city and county; and if it had not been intended to provide for these advances, the language would have been such as to exclude them. It appears, too, that the court-house commissioners were the only county commissioners, strictly speaking, to which the act could apply, and there was no other claim for advances made to the county presented under the act. It is true that these advances were illegal, and so were all the other advances referred to.

These advances were made in good faith, and all the moneys advanced were used for the county except the sum of $45,000, fraudulently diverted by the conspirators. The fact that the conspirators were among the directors of the bank did not deprive its innocent directors, stockholders and creditors of all claim to just consideration, and did not make it an outlaw without rights, a *caput lupinum* entitled to no protection.

· While the legislature may not always be held to have had full knowledge of all the facts and consequences involved in its action, its ignorance cannot be presumed for the purpose of nullifying the plain meaning of its language. But we have no right to assume that if the legislature had known the precise facts as they now appear in this record, it would have

refused to ratify a claim for moneys thus advanced in accordance with a common practice, in good faith, a small portion of which only was misappropriated by the trusted agents of the county. As the plain language embraces these advances, they should not by construction be taken out of the statute, except we can clearly perceive a legislative intention that they should not be embraced ; and that, upon a consideration of all the facts, we are unable to perceive.

It is further claimed that the legislature was not competent to ratify these advances and make them a binding obligation on the county. It is said that it could not originally have authorized advances to be made to the conspirators for fraudulent division among themselves, and that hence it could not ratify such advances. This may be conceded ; but here these advances were made in good faith, not to be divided among the conspirators, but to and for the use of the county. This the legislature could have authorized, and the county would have been bound, although the conspirators had misappropriated all the money ; and what it could originally have authorized it could ratify and confirm. Municipal corporations are creatures of the state and exist and act in subordination to its sovereign power. The legislature may determine what moneys they may raise and expend, and what taxation for municipal purposes may be imposed ; and it certainly does not exceed its constitutional authority when it compels a municipal corporation to pay a debt which has some meritorious basis to rest on. The provisions of this act are sanctioned by the principles of the following decisions : *Town of Guilford* v. *Supervisors* (13 N. Y. 143) ; *Brewster* v. *City of Syracuse* (19 id. 116) ; *Darlington* v. *Mayor, etc.* (31 id. 164) ; *Brown* v. *Mayor, etc.* (63 id. 239).

We, therefore, conclude that judgment allowing defendant's counter-claim was right and should be affirmed.

All concur.

Judgment affirmed.