THE MERCHANTS' NATIONAL BANK of Binghamton, N. Y., Appellant, *v.* BENJAMIN F. TRACY and FRANK B. TRACY, Respondents.

*Action on a check — what is not a mistrial — a bank is chargeable with the knowledge of its cashier — renewal check tainted with the original fraud — return of the former check unnecessary — rescision of contract — courts will not protect a person from the consequences of his own dishonesty.*

The trial of an action was commenced before a jury which passed on the several questions submitted to it, and thereafter further findings of fact were made by the court.

*Held,* that it must be assumed that there was not a mistrial; that it was in substance a trial by the court without a jury, and a decision upon the whole evidence, with the aid of the jury as to the questions of fact submitted to it.

The evidence considered and commented upon which is insufficient to establish, as a matter of law, that a person is a *bona fide* holder without notice of a check, and under which a finding of fact that he is not a *bona fide* holder is not against the weight of evidence.

A person had been acting for some time as the cashier of a bank, having supervision of its affairs and charge of its discounts and collections, and, as such cashier, had charge of the discount of a check, a recovery upon which it was sought to defeat, upon the ground that it was obtained by fraud.

*Held,* that the cashier's acts were binding upon the bank, and that it was chargeable with his knowledge or the notice he had in relation to the matter.

A post-dated check was delivered to the cashier of a bank, which upon the maturity of the check had not acquired a *bona fide* ownership thereof. Upon the trial of an action brought to recover the amount of a check given by its maker in renewal thereof, it appeared that the cashier of such bank co-operated with the person who procured such check to be discounted to obtain an extension of time or a renewal of the check.

*Held,* that, as the bank did not have title as a *bona fide* holder of the first check, it

had no valid claim against the maker of the second check, which was tainted with the original fraud.

Where a bank, holding a note with indorsers vitiated by fraud of which the bank had knowledge, takes a new note in renewal thereof, surrendering the first note, it cannot set up as an answer to the defense of fraud, interposed to an action on the second note, that the first note has not been returned to it, where it appears that the indorsers on the first note could not be held by the bank for its payment.

*Semble*, that the first note would be of no more value to the plaintiff than a note from which the name of the maker was stricken, leaving only the names of the indorsers thereon.

It is unnecessary for a party to a piece of fraudulent paper to return it to a person, not entitled to enforce it because of such fraud, as a condition precedent to the right to defeat a recovery upon another piece of paper given in substitution therefor, in continuation of the fraud, and as a part of the same fraudulent scheme, which defeats the right of recovery against the makers of it.

In cases of the rescision of a contract, the rule is that the party shall not retain the thing which is the subject of the contract.

If a fraudulent purchaser of property suffers what is due to his own fraudulent and dishonest act, the court will not strive to protect him from these consequences of his own dishonesty.

APPEAL by the plaintiff, The Merchants' National Bank of Binghamton, N. Y., from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Broome on the 20th day of March, 1893, upon the decision of the court, rendered after a trial at the Broome Circuit, dismissing the plaintiff's complaint upon the merits.

The trial commenced May 23, 1892, in the Circuit Court before a jury, and continued until the twenty-eighth of May, when a jury trial was waived by both parties, and by their consent the following questions were submitted to the jury, which were answered in the affirmative:

" *First.* Was the check of date June 15th, obtained by Gregg from Frank Tracy by fraud, in pursuance of a fraudulent conspiracy between Gregg and Frederick Ross to sell the stock of the Hydraulic Power Company at a fictitious value? (Answered—Yes.)

" *Second.* Did Gregg procure Frank Tracy to apply for the surrender of the first check, and for the substitution of the second, in furtherance of such conspiracy and for the purpose of making more certain the defendants' liability? (Answered—Yes.)

" *Third.* Was the participation of Frederick Ross in such con-

spiracy, if one existed, in the interest and for the benefit of the Merchants' National Bank as well as his own interest? (Answered—Yes.)"

Thereafter the court made twenty-three findings of fact and three conclusions of law.

Plaintiff's complaint alleged that on the 1st day of July, 1889, the defendants made their check in writing, which was in the following words and figures:

"OWEGO, N. Y., *July* 1, 1889.

"Owego National Bank, pay to the order of F. E. Ross, cashier, four thousand and eleven 75 —— dollars ($4,011.75).

"(Signed)        B. F. TRACY & SON."

The answers of the defendants set up failure of consideration, fraud and fraudulent representations made to induce the execution and delivery of the check.

It was found as a fact by the court that on the 30th of May, 1889, "Dudley W. Gregg was the manager of a corporation organized and doing business under the laws of the State of New York, and known as the Binghamton Hydraulic Power Company. That upon said date one Frederick Ross was the cashier of plaintiff, and so continued till the time of the trial of this action."

"*Fifth.* That upon said 30th May, 1889, said Gregg procured from said Frank B. Tracy, acting for and by authority of said firm, a check for $4,000, dated June 15th, 1889, to the order of Dudley W. Gregg; said check was drawn upon the Owego National Bank, and signed 'B. F. Tracy & Son.'

"*Sixth.* That said check was afterwards indorsed by said Gregg and by the Binghamton Hydraulic Power Company, and discounted by plaintiff, acting through said cashier, and the proceeds thereof were, at the request of said Gregg, placed to the credit of the Hydraulic Power Company.

"*Seventh.* That upon said 15th June said check was duly presented for payment at the Owego National Bank and payment demanded, which was refused, and of which refusal due notice was given to the makers and indorsers thereon.

"*Eighth.* That on or about the 18th day of June, 1889, at the request of the defendants, plaintiff surrendered the said check dated June 15th, with its indorsements thereon, and in place thereof took

defendants' check for $4,011, dated 1st July, 1889, made payable to the order of Fred Ross, cashier, and drawn upon the same bank as was the prior check, and signed B. F. Tracy & Son; that said check was discounted by said plaintiff and duly presented when due, and payment refused; that this action is brought to recover upon said check.

"*Ninth.* That said check of date June 15th was given as a partial payment upon certain stock of the Binghamton Hydraulic Power Company, which the said Gregg then contracted to sell to the defendants.

"*Tenth.* That at the time of the giving by the defendants of the said check of date June 15th to the said Gregg, the said Gregg represented to the said defendants that the said Hydraulic Power Company was in a prosperous condition; that when engines were sold by the said company drafts were always drawn on the customers to whom the said engines were sold, and the said drafts were always paid, and the said engines had always given satisfaction to the parties using them; that the company was organized under the laws of the State of New York with a full paid-up capital stock of $50,000.

"*Eleventh.* That said representations were, and each one thereof was, false and untrue; that the said company was not in a prosperous condition; that drafts drawn upon customers when engines were sold were not always paid; that the engines had not always given satisfaction to the parties using them, and had seldom given satisfaction, if at all, to any parties using them; that the said company was not organized with a full paid-up capital stock of $50,000, and that a very small part of the said capital stock of $50,000 was actually paid by the stockholders therein.

"*Twelfth.* That said representations when made by the said Gregg to the defendants were known by the said Gregg to be false and untrue, and they were made by the said Gregg with intent to deceive the said defendants, and to induce them to purchase the said stock, for which the aforesaid check of June 15th was given as a partial consideration.

"*Thirteenth.* That the aforesaid representations were material representations, and were representations of material matters to be considered in the purchase of the said stock; that the said defendants believed them to be true, and were induced thereby to make

the contract for the purchase of the said stock and to give the afore-
said check of date June 15th in partial payment thereof.

"*Fourteenth.* That the check upon which this action is brought,
of date July 1st, was, upon the 18th day of June, 1889, given in
consideration of and as a substitute for the said check of June 15th;
and at the time of the giving of the said check by the said defend-
ants, they were still ignorant of the falsity of the representations
made by the said Gregg, and by means of which the said check of
June 15th was from them obtained." This action was commenced
on or about the 17th day of August, 1889.

"*Sixteenth.* That after the commencement of this action the
defendants for the first time discovered that the aforesaid represen-
tations by the said Gregg were false and untrue, and for the first
time discovered the fraud practiced upon them by the said Gregg in
the procurement from them of the said check of date June 15th,
and in their answer they have set forth the facts constituting the
fraud, and have offered to return upon the trial whatever the court
shall say they are not entitled to retain.

"*Seventeenth.* That upon the trial of this action the said defend-
ants, in open court, tendered to Dudley W. Gregg the stock which
was delivered to them as a part consideration for which the said
check of June 15th was given, and also a note which was given by
the said Gregg to the said defendants to assist the said defendants in
raising money with which to pay the said check before the discovery
by the said defendants of the aforesaid fraud.

"*Eighteenth.* That the making by the said Gregg of the said
fraudulent representations, by which the aforesaid check of June
15th was obtained from the defendants, was in pursuance of a fraud-
ulent conspiracy between the said Dudley W. Gregg and the said
Frederick Ross to sell the stock of the Hydraulic Power Company
at a fictitious value.

"*Nineteenth.* That the said Gregg procured the defendants to
apply to the said Frederick Ross, as cashier of the plaintiff bank,
for the surrender of the first check, to wit, that of date June 15th,
and for the substitution therefor of the second check, to wit, that of
date July 1st, in furtherance of such fraudulent conspiracy, and for
the purpose of making more certain the defendants' liability
thereupon.

" *Twentieth.* That the participation of Frederick Ross, in such conspiracy was in the interest and for the benefit of the Merchants' National Bank, as well as in his own interest.

" *Twenty-first.* That the Merchants' National Bank at the time of the discounting of the first check, to wit, the check of June 15th, had full knowledge of the fraud of the said Gregg, aforesaid, by which said check was procured.

" *Twenty-second.* That the said Merchants' National Bank in discounting the said first check acted in bad faith, and did not become a *bona fide* holder thereof.

" *Twenty-third.* That the said Merchants' National Bank in substituting the second check, the one upon which this action is brought, for the first check, acted with full knowledge of the fraud by which the said first check was obtained, and with full knowledge of the fraud by which the said second check was substituted therefor, and received the same in bad faith, and did not become a *bona fide* holder thereof."

The court found as conclusions of law, viz. :

" *First.* That the defendants are entitled to rescind the said contract under which was given the first check, to wit, that of date June 15th, by reason of the fraud practiced in the procurement of the same.

" *Second.* That the defendants are entitled to rescind the contract by which the said second check, which is the one upon which this action is brought, was substituted for the first check, by reason of the fraud practiced in the procurement of the same, and also by reason of the fraud practiced in the procurement of the first check, for which the said second check was substituted.

" *Third.* That the defendants are entitled to a judgment dismissing the plaintiff's complaint upon the merits, with costs, which judgment is directed accordingly."

*Edmund O'Connor*, for the appellant.

*George B. Curtiss*, for the respondents.

HARDIN, P. J. :

Although the trial of this action was commenced before a jury, and the jury passed on the several questions submitted to them, and their further services in the case were waived by consent of both.

parties to the action, and further findings of fact were made by the court, it must be assumed there was not a mistrial. A somewhat similar course was adopted in *Carr* v. *Carr* (52 N. Y. 252), and in the course of the opinion delivered in that case, which was decided by the court after the findings made by the jury, it was said : " It was in substance, then, a trial by the court without a jury, and a decision upon the whole evidence with the aid of the finding of the jury upon two questions of fact." (Opinion of ALLEN, J., page 255.)

(2) It is insisted on behalf of the plaintiff that it paid full value for the check in question, and became a *bona fide* holder for value. In considering this question it is appropriate to recall some of the leading features of the evidence bearing upon the question of the ownership by the bank of the first and second checks. From the evidence it appears that in the fall of 1886, F. E. Ross and Gregg had become instrumental in organizing and bringing into existence a gas machine company; a patent had been issued for a gas machine which was owned by one Hanford, and a one-half interest therein was purchased by Ross for some $4,000, and that patent was put into the company, which was capitalized at $25,000, and the stock was issued to Ross and Hanford, each taking one-half in the concern, which commenced business and began to borrow money of the plaintiff. This company apparently continued until early in July, 1888, when it was embarrassed and its stock became of little or no value. The gas machine did not prove of much value. Frederick E. Ross was president, and Clinton Ross, a brother, was treasurer, and Gregg acted as secretary, and they were directors. In June, 1887, Fred Ross, Gregg, Clinton Ross and others initiated and organized a company known as the Binghamton Hydraulic Power Company. One Van Deusen had obtained a patent for a water motor. It was first proposed to organize the company with a capital of $15,000 ; subsequently Fred Ross and Gregg concluded to capitalize it at $25,000. Steps were taken to organize the hydraulic company, and the stock thereof was to be divided among them — Ross, $6,000 ; Gregg, $6,000 ; Clinton Ross, $6,000 ; and Van Deusen, for his patent, $5,000 ; and Scott was to receive $1,500 for some tools and Grift, $500 — thus the stock, 250 shares, was distributed. Fred Ross, Clinton Ross and Gregg received their stock from the company without paying any money to the company ; and the com-

pany set out in business by borrowing from the plaintiff some $750. Its directors were, Clinton Ross, president; Scott, vice-president; Gregg, secretary and general manager. In bringing into existence these two companies Fred Ross and Gregg were active instruments; and in January, 1888, efforts were made to consolidate the two companies, and changes were made in the certificates of stock of the hydraulic company so that there was inserted in the certificates the words "Fully paid capital stock $50,000," instead of the words "Fully paid capital stock $25,000." From about that period of time it would seem that the gas machine company was regarded as dormant, and was abandoned; the shares of stock that had been issued in the gas machine company apparently were attempted to be extinguished by the issuance of shares in the hydraulic company. After these changes were made in a somewhat irregular manner it appears that Erastus Ross became the owner of some twenty shares of the hydraulic stock, and Fred Ross of some 200 shares, and Clinton Ross of some seventy shares, and Gregg of about 160 shares, and, apparently, the hydraulic company was supposed to assume the debts of the gas company. The banking business of the two companies was transacted with the plaintiff. Erastus Root was its president, and F. E. Ross was its cashier, and Clinton Ross was a director, and they owned a large portion of the stock of the plaintiff. It was conceded on the trial that no certificate was ever filed stating that the hydraulic power company's stock had been paid for in full, and that no annual report was ever made. It appears that a meeting of the directors of the Automatic Gas Machine Company was held on May 5, 1887, "at the Merchants' National Bank," at which all the directors were present except Mr. Hanford, and that a motion was there adopted "That this company pay a royalty or license fee of fifty per cent upon the selling price of such motors and blowers machines which have been or may be used by them, said royalty to be paid to Mr. Frederick E. Ross and Mrs. Anna C. Gregg" (she being the wife of D. W. Gregg). It appears that on January 28, 1889, Gregg sold ten shares of the stock for twenty-five cents on a dollar. In May, 1889, the plaintiff held notes of the hydraulic company amounting to some $21,000, and the plaintiff held drafts which it had discounted and which had not matured, something over $9,000; and evidence was given tending to show that the liability of

the company exceeded their nominal assets by some $12,000. Other
evidence was given tending to show that the hydrauiic company was
insolvent in the month of May, and that its stock had little or no
intrinsic value; and that the sales of the company fell off from some
$4,200 in January, to some $1,200 in the month of May; and that
in the month of May their expenses were more than their receipts,
and that their sales in the month of April were but a small sum
above the actual expenses of operating the company; and that during
many of the days in the month of May their account was overdrawn
at the bank of the plaintiff, to wit, on the twentieth day of May the
account was overdrawn $3,599; on the twenty-first, $2,356; on the
twenty-fourth, $774; on the twenty-fifth, $2,533; on the twenty-
seventh, $971; on the twenty-eighth, $1,576; on the twenty-ninth,
$1,809; and that the president and cashier of the plaintiff in the
early part of 1889 had become somewhat alarmed, restive and
impatient with the situation of the financial affairs of the hydraulic
company, and were taking measures to have the indebtedness of the
hydrauiic company to the plaintiff reduced and reinforced; and such
solicitude and action of the officers of the plaintiff were communi-
cated to Gregg, and he was urged to devise some means by which
the desired result could be accomplished. Apparently, he set out
with a view of selling some of the stock of the company held by him
and Cashier Ross, and with that end in view he obtained an option
from Cashier Ross, and armed with that he commenced negotiations
for the sale of the stock of the hydrauiic company, some of it standing
in the name of the cashier, and some of it standing in his name, and
apparently some of the stock of the company had been hypothecated to
the plaintiff. On the 20th of May, 1889, the defendant Frank Tracy
went to the office of the hydraulic company to buy an oil machine,
and while there observed that he was out of active business. There-
upon Gregg commenced a negotiation with him, and made state-
ments as to the situation and condition of the affairs of the hydrau-
lic company; that was followed by other interviews; and subse-
quently Frank Tracy, whose relations with Fred Ross had been
somewhat intimate, although he did not know that the Rosses
were connected with the company, visited the plaintiff's bank,
going directly from the hydraulic company's office to see Fred Ross,
and while at the bank asked him if he knew anything about the

Binghamton Hydraulic Power Company, and he testifies that Ross replied: "The company is all right, and if properly managed, will make $30,000 a year." On the thirtieth of May, Gregg, in accordance with a telephone message sent to Frank Tracy, went to Apalachin, and Mr. Tracy met him there and drove him over to his farm, where he renewed his solicitations to young Tracy that he come into the company and buy some of the stock; and in the course of the interview it was learned that Richards held a contract with the company for the right to manufacture the engine under the patent for two years, and when making some objection to that, Gregg immediately said that Richards was willing, provided Tracy would come into the company, to make an agreement with the company to manufacture the engine during the life of the patent, "for the entire world." Thereupon a proposition in writing to that effect was drawn and signed by Richards, who shortly thereafter left, and Gregg continued his negotiations with Tracy, who assured Gregg that he would not "come into the company without first consulting his father." Upon representations further made in the course of that interview, Frank Tracy was induced to and did prepare two checks, one for $1,000 and one for $4,000, and delivered them to Gregg, and at the same time took from him a receipt in the following language:

"BINGHAMTON, *May* 31*st*, '89.

"Received of Frank B. Tracy his check dated June 1st, amt. one thousand dollars ($1,000). This sum to be applied on the fifty shares of stock owned by F. E. Ross, he to give an option on his fifty shares for ten days from June 1st, and in case Mr. Tracy does not purchase the balance of the fifty shares, to return the check or its equivalent. Also his check for four thousand dollars ($4,000), dated June 15th, for which I agree to deliver on June 15th ninety-six shares of Binghamton Hydraulic Power Company's stock. In case said Tracy should not come into the company, said check or its equivalent to be returned, and the ninety-six shares returned to me.

"(Signed)        D. W. GREGG."

Gregg and Frank then agreed to go to Washington and have an interview with the senior Tracy, and they were to meet in Brooklyn on the morning of June first, and before they parted Frank testifies that he said to Gregg: "Under no condition must those checks be

used until you hear from me." On the following day Gregg sent the certificates for ninety-six shares of stock by a messenger to Frank Tracy. On the morning of May thirty-first Gregg saw Frank Ross at the Merchants' National Bank, and he had the two checks with him at the time he went to the bank, and he handed both checks, one for $1,000, first to Cashier Ross, and "told him that was his check for his option on the fifty shares," and thereafter handed him the check for $4,000, and "told him it was for 96 shares of my stock, and that I was depositing it to the credit of the Binghamton Hydraulic Power Company." Gregg testifies that he told Ross that he was selling it to the Tracys at par, and he adds in his testimony: "I think I told him the agreement. I cannot recollect the full conversation; I remember telling him that Frank was going to investigate the company, and see his father, and that I was going to Washington with him to see his father in regard to raising the balance of the money, and I thought he would go that very evening, and perhaps I should go with him, and that is about all I can remember. I think I said that Mr. Tracy was going to Washington that night to see his father in regard to raising the money to come into the company, but nothing was said in regard to investigating it that I remember, not at that time." Gregg presented to Cashier Ross the paper which he had heretofore received from him, giving him an option, and took a receipt for the $1,000 on the back of it, which option bore date May 22, 1889. We are of the opinion that the evidence, although conflicting, warranted a finding that the scheme which was on foot to obtain from the Tracys money for the stock at par was fraudulent, and was known to be so by Gregg and by Ross, and that when Gregg received the check of $4,000, it was with an understanding that it was not to be used until after a conference was had with the senior Tracy, and a determination made to purchase greater interest in the hydraulic company, and that the check of $4,000 was diverted from its proper use by Gregg when he delivered it to the cashier, and that it was a breach of the agreement made with Frank Tracy, as shown by the quotation made. Gregg testifies that he communicated the agreement to Cashier Ross at the time he delivered the $4,000 check; while this fact may be said to be disputed by the testimony of Ross as a witness, it was for the trial court to determine whether faith and credence should be

given to the testimony of Ross, situated as he was, largely interested in the financial affairs of the plaintiff, and charged with the perpetration of a wrong upon the defendants. According to the tenor of the opinion delivered by RUGER, Ch. J., in *C. N. Bank* v. *Diefendorf* (123 N. Y. 191), his testimony might, in accordance with the rule laid down in that case, be disbelieved. In accordance with what was said in that case, the onus was on the plaintiff to establish that it received the $4,000 check in good faith. We think the trial court was warranted in finding that the plaintiff did not acquire in good faith title to and ownership of the check of $4,000 delivered to it on the 31st day of May, 1889, under the circumstances disclosed by the evidence. (*C. N. Bank* v. *Diefendorf, supra; Vosburgh* v. *Diefendorf*, 119 N. Y. 357.)

With the antecedent knowledge of the affairs of the hydraulic company and with the negotiations that had been initiated between Gregg and Frank Tracy on the twentieth of May, with the circumstance of the knowledge that two days thereafter, to-wit, on the twenty-second of May, Fred Ross gave an option to sell fifty shares of his stock at par, with the facts relating to the obtaining of that option, and the facts testified to by Gregg in respect to the negotiations with Tracy and all the features of the case, we are unwilling to say that the court committed any error in disregarding the testimony of Ross upon the subject of want of knowledge or notice of the qualified rights of Gregg in the check of $4,000. It may be observed that the check, although delivered on the thirty-first of May to the bank, was post-dated to the fifteenth of June, and that circumstance is suggestive of the idea that for some reason the party presenting the check was not entitled to receive the proceeds thereof until that lapse of time, and that is a circumstance, coupled with the testimony of Gregg, worthy of some consideration in determining the conflict found in the testimony between the version given by Ross as a witness and the other evidence before the court relating to the subject of the *bona fide* ownership by the plaintiff of the check of $4,000. We think the contention of the plaintiff that it was a *bona fide* holder, without notice, of the check for $4,000 must fail. We are also of the opinion that upon all the evidence it was a question of fact to be determined as such and not a question of law. (*Franc* v. *Dickinson*, 34 N. Y. St. Repr. 864.) And we are further of the

opinion that the finding is not against the weight of evidence. (*Bullion* v. *Bullion*, 73 Hun, 437.)

(3) It is contended in behalf of the appellant that, although Fred Ross was guilty of a conspiracy with Gregg, the bank is not affected by his knowledge and acts and co-operation in carrying out the fraudulent scheme. The evidence discloses that he was and had been for some time acting as the cashier of the plaintiff, having supervision of its affairs, and that he had charge of the discounts and collections in behalf of the plaintiff, and it also discloses that when he received the check of $4,000 he was acting in his capacity as cashier and his acts were binding upon the plaintiff, and the plaintiff is, therefore, chargeable with knowledge or the notice that Ross had in the premises.

This case differs from *Mayor* v. *Tenth National Bank* (111 N. Y. 457), referred to by the appellant. In that case the directors, who were conspirators, did not represent the bank in the transactions, and in the opinion, at page 457, it is said: "The sole agent and representative of the bank was Bliss, its president, and he was entirely innocent of any wrong. The knowledge these conspirators had while engaged in their fraud for their own benefit could not, therefore, be attributed to the bank; and to this effect are all the decisions." *Atlantic State Bank* v. *Savery* (82 N. Y. 307) is also distinguishable from the case before us. Nor do the cases of *Casco N. Bank* v. *Clark* (139 N. Y. 307) and *Merchants' National Bank* v. *Clark* (Id. 314) support the contention of the appellant. We think this case is more like *Holden* v. *New York & Erie Bank* (72 N. Y. 286), where it was held: "Where an agency is continuous and made up of a long series of transactions of the same general character, knowledge acquired by the agent in one or more of the transactions is notice to the agent and the principal, which will affect the latter in any other transaction in which the agent, as such, is engaged, and in which the knowlege is material."

In *Cragie* v. *Hadley* (99 N. Y. 134) it is said: "But the general rule is well established that notice to an agent of a bank or other corporation intrusted with the management of its business, or of a particular branch of its business, is notice to the corporation, in transactions conducted by such agent, acting for the corporation, within the scope of his authority, whether the knowledge of such agent was

acquired in the course of the particular dealing or on some prior occasion."

In the course of the opinion delivered by MASON, J., in *Davis* v. *Bemis* (40 N. Y. 454, note), he said : " For it is a general principle of law that the principal is held liable to the public or third persons in a civil action for the frauds, deceits, concealments, misrepresentations, torts, negligence and other malfeasances in the course of his employment, although the principal did not authorize or justify or participate in it or indeed know of such conduct."

In *Garner* v. *Mangam et al.* (93 N. Y. 642) it appeared that defendants by means of false representations induced plaintiff to purchase 120 shares of stock which was utterly worthless ; each of the defendants contributed forty shares, and all were parties to the fraud. In the course of the opinion it was said that one of the defendants " could not receive the fruits of the bargain without being responsible for the fraud through which it was effected."

It seems to follow from what has already been said that when the check which was delivered to the plaintiff dated the 15th of June, matured, the plaintiff had not acquired an ownership thereof in good faith ; and it appears by the evidence that its cashier co-operated with Gregg in a scheme to procure an extension of time or the renewal check which is made the basis of this action. There is testimony to the effect that Gregg prepared a letter to be addressed to the cashier with a view of securing an extension of time for the payment of the first check. Inasmuch as the plaintiff did not have title as a *bona fide* holder of the first check, it had no valid claim against the defendants by reason of the check given in renewal thereof, which was tainted with the fraud relating thereto. It is, however, contended in behalf of the appellant, that because the first check was not returned to the plaintiff, before the commencement of this action, that it is in a situation to recover on the second check. In dealing with that question it is to be observed that the first check was made payable to the order of Gregg, indorsed by him and also by the hydraulic power company. Gregg was an officer of the hydraulic power company, and through him it derived knowledge of the fraud being perpetrated by him, and his knowledge is imputable to that company.

In *Putnam* v. *Schuyler* (4 Hun, 166) it was held to be error to

exclude evidence showing that notes were obtained by fraud and that they were without consideration in an action against the defendant who had guaranteed the payment of them; and in the course of the opinion it is said: "If, in the principal obligation, there is essential vice which may annul it, as if it has been contracted by force, if it is contrary to law, or to good manners, *if it be founded only on a fraud,* or on some error which may suffice to annul it; in all these cases the obligation of the surety is likewise annulled." It does not seem too much to say that if the bank held a fraudulent piece of paper with notice of the fraud, indorsed by one of the parties perpetrating the fraud and by another party having knowledge of the fraud and after such knowledge received moneys wrongfully thereon, then the holding of such paper by the plaintiff would not give it any additional right of recovery against the indorsers of the paper. Besides it seems anomalous to require of a party to a piece of fraudulent paper to return it to a person not entitled to enforce it, because it is tainted with fraud as a condition precedent to the right to defeat a recovery upon another piece of paper given in substitution therefor in continuation of the fraud, and as a part of the scheme fraudulent in itself, which defeats the right of recovery against the makers of it. Such a piece of paper would seem to be of no more value to the plaintiff than one where the name of the drawer of a check was stricken therefrom, leaving only the indorsements thereon. The defendants are in a position of asserting that the contract for the purchase of the stock was fraudulent and void and of repudiating that contract, and whatever the defendants received under that contract they offered to return at the trial, to wit, the surrender of the shares of stock which were delivered to the defendants on the first of June. Surely the defendants have acquired nothing more of value to them, and if the observations already made are correct they have received nothing under the contract, which they repudiate, of any value to the plaintiff. In this case the defendants are seeking to withhold their moneys from the payment of a check that is tainted with fraud. They allege and furnish evidence indicating that the first check was obtained and diverted by fraudulent representations, and that, in continuance of the fraud and scheme in which the conspirators were engaged, the second check was obtained from them in furtherance and con-

tinuation of the fraud attempted to be perpetrated upon them. When they surrendered the certificates they surrendered all that they had acquired in the premises.

In cases of rescission of a contract the rule is, "that the party shall not retain the thing which is the subject of the contract." (*Harris* v. *Equitable Life Ins. Co.*, 64 N. Y. 200.) It may be said the respondents' defense is both legal and equitable, and as said by BOARDMAN, J., in *Green* v. *Smith* (29 Hun, 168): "If the plaintiff suffers it is due to his own fraudulent and dishonest act, and courts will not go to the romantic extent of striving to protect a fraudulent purchaser of property from the consequences of his own dishonest act."

In *Masson* v. *Bovet* (1 Den. 74), in the course of the opinion delivered by BEARDSLEY, J., he said, in speaking of a person who had perpetrated a fraud, that "If, therefore, he has so entangled himself in the meshes of his own knavish plot, that the party defrauded cannot unloose him, the fault is his own; and the law only requires the injured party to restore what he has received, and, so far as he can, undo what had been done in the execution of the contract. This is all that the party defrauded can do, and all that honesty and fair dealing require of him. If these fail to extricate the wrong-doer from the position he has assumed in the execution of the contract, it is in no sense the fault of his intended victim, and upon the principles of eternal justice, whatever consequences may follow they should rest on the head of the offender alone."

Assuming, as I think we should, upon the whole evidence that the second check was obtained by means of fraudulent representations and in furtherance of the scheme to defraud the defendants, probably the plaintiff is entitled to recover damages against Gregg and the hydraulic company by reason of the fraud which induced it to part with its moneys to the hydraulic company irrespective of that indorsement upon the check which was fraudulent in its inception, and to which, as before seen, the plaintiff did not acquire title in good faith.

The foregoing views lead to the conclusion that the decision made at the Circuit, and the judgment entered thereon, should remain.

MARTIN and MERWIN, JJ., concurred.

Judgment affirmed, with costs.