[Civ. No. 1376. Fourth Appellate District.—July 8, 1935.]

THE CITY OF LOS ANGELES (a Municipal Corporation) et al., Respondents, v. W. W. WATTERSON et al., Defendants; ROBERT D. CROWELL, as Executor, etc., et al., Appellants.

334

Lucius K. Chase, Chase, Barnes & Chase, E. R. Young, Young, Lillick, Olson, Graham & Kelly and Lawler & Degnan for Appellants.

Ray L. Chesebro, City Attorney, James M. Stevens, Assistant City Attorney, F. M. Bottorff and Carl A. Davis, Deputies City Attorney, and T. B. Cosgrove, Special Counsel, for Respondents.

HARDEN, J., *pro tem.*—On August 7, 1923, the electors of Owens Valley Irrigation District voted to issue bonds of said district in the amount of $1,650,000. On January 23, 1924, the board of directors thereof adopted a resolution authorizing the sale of bonds of said issue amounting to $736,000. On the date fixed for the reception of bids, February 14, 1924, a bid for bonds of the par value of $471,500 was presented in the name of M. H. Lewis & Company by C. A. Sheedy, vice-president, under circumstances hereinafter stated. Accompanying the bid was a cashier's check of $8,400 to apply as part payment. The bid was accepted and on or about February 15, 1924, the sum of $411,999.78 was paid by checks of M. H. Lewis & Company to apply on the purchase and payment of said bonds in accordance with the terms of the bid.

At the time of the transactions herein mentioned, prior to March 3, 1925, defendant W. W. Watterson was chairman and a member of the board of directors of said district. M. Q. Watterson, a brother of defendant W. W. Watterson, was at all of said times treasurer of said district. The other members of said board were D. M. Longyear, J. L. Gish, also defendants herein, George B. Warren and Lawrence J. Bodle. Director D. M. Longyear was a son of defendant W. D. Longyear. At all said times defendant W. W. Watterson was president and a member of the board of directors of Watterson Brothers, Inc., a corporation, and defendant M. Q. Watterson was secretary-treasurer and a member of the board of directors thereof; and said persons constituted a majority of the members of said board, and controlled its business affairs and management. M. H. Lewis was president and C. A. Sheedy was vice-president of M. H. Lewis & Company; and said officers owned the majority of the stock of said company, were directors thereof, and controlled its business affairs. Defendants Caleb T. Crowell and W. D. Longyear were owners of lands within said irrigation district.

The action of the board of directors of said district in accepting the bid of M. H. Lewis & Company for said bonds was accomplished by the affirmative votes of directors W. W. Watterson, D. M. Longyear and J. L. Gish, against the negative votes of directors Warren and Bodle. Director W. W. Watterson cast the deciding affirmative vote.

This action was instituted November 17, 1927, by the City of Los Angeles and the Department of Water and Power of said city, municipal corporations, taxpayers and owners of lands within said district, in behalf of themselves and of the other landowners and interested parties in the district, to compel the purchasers of said bonds in the amount of $471,500 to deliver the same to said district or, in default thereof, to pay to it the value of said bonds and attached coupons not delivered, and for injunctive relief.

The plaintiffs alleged, and the court found, in part as follows: That said sale of bonds was invalid by reason of the direct interest therein of W. W. Watterson as director of said district and of M. Q. Watterson as treasurer thereof; that prior to February 14, 1924, W. W. Watterson and M. Q. Watterson conspired and agreed with W. D. Longyear, Caleb T.

Crowell, M. H. Lewis & Company, M. H. Lewis and C. A. Sheedy for the submission of a bid for a portion of said bonds in the amount of $471,500 in the name of M. H. Lewis & Company, without disclosing the interest of the other parties therein; that it was agreed between the parties to said conspiracy that W. W. Watterson, M. Q. Watterson, W. D. Longyear and Caleb T. Crowell would arrange for, provide and advance the funds necessary to consummate the purchase of said bonds in accordance with the terms of said bid and that upon the purchase thereof said Wattersons, Crowell and W. D. Longyear would make and maintain satisfactory banking arrangements for carrying said bonds on loans or otherwise for defendant M. H. Lewis & Company, would furnish any margin required for carrying said bonds, and would fully protect, indemnify and reimburse M. H. Lewis & Company for any losses, costs, liabilities and expenses which that company should suffer or incur by reason of the purchase or sale of the whole or any part of said bonds; that said Wattersons, Crowell and W. D. Longyear would be entitled to acquire and receive one-half of the bonds so purchased at the price for which said bonds were purchased; that, pursuant to said plans, the Wattersons, W. D. Longyear, Crowell, M. H. Lewis & Company, M. H. Lewis and C. A. Sheedy did make and maintain banking arrangements for carrying said bonds and did provide, arrange for and advance the money to be used in the purchase and acquisition of said bonds; that, pursuant thereto, the Wattersons, Longyear and Crowell did acquire possession of one-half of said bonds; that all of said acts and agreements of the Wattersons were done and made in the name of Watterson Brothers, Inc., but were on behalf of W. W. Watterson and M. Q. Watterson individually; that at all times the parties to said conspiracy and agreement knew that W. W. Watterson was president and a member of the board of directors of Watterson Brothers, Inc., and that said M. Q. Watterson was secretary and director thereof, and that they controlled the majority of the stock thereof and its financial and business policies, and also knew that W. W. Watterson was chairman and a member of the board of directors of said irrigation district and that M. Q. Watterson was treasurer thereof; that the payment of $411,999.78 was made by eight checks of

$50,000 each and one of $11,999.78, made payable to the order of M. Q. Watterson, treasurer of said district; that said checks were delivered to W. W. Watterson in Los Angeles on or about February 15, 1924, and that on that day he took the same to Keeler, Inyo County, and procured the endorsement thereof by M. Q. Watterson, treasurer of said district, either to Inyo County Bank, or order, or to First National Bank of Bishop, or order (banks in which the Wattersons were officers and which were managed and controlled by them); that said checks were then returned to W. W. Watterson; that thereafter practically all of the proceeds thereof were converted to the personal use of W. W. Watterson and M. Q. Watterson, which conversion they confessed on or about September 15, 1927; that all of the bonds were delivered to Lewis & Company on or about February 15, 1924; that said delivery was procured through the conspiracy and agreement aforesaid; that the irrigation district did not receive any money or benefit therefor; that at the time of the judgment hereinafter mentioned M. H. Lewis & Company, Lewis, and Sheedy held 65 of said bonds of the par value of $500 each, the legal representatives of defendant Crowell held 760 thereof, and W. D. Longyear held 118 thereof; that defendants D. M. Longyear and J. L. Gish had no guilty knowledge of the matters complained of prior to the commencement of the action; that plaintiffs did not discover, and had no means of discovering, the fraud complained of until about September 15, 1927.

Caleb T. Crowell died after trial and before judgment and the defendants Robert D. Crowell and Security-First National Bank of Los Angeles were appointed executors of his will and were substituted as defendants herein.

The findings were in favor of the plaintiffs and against the defendants W. W. Watterson, M. Q. Watterson, said executors of the will of Caleb T. Crowell, W. D. Longyear, M. H. Lewis & Company, M. H. Lewis, and C. A. Sheedy on practically all issues. Judgment was entered accordingly on December 15, 1932, and ordered that said defendants deliver to the clerk of the court within 90 days all of the bonds and their coupons so purchased; that upon default thereof plaintiffs have judgment against said defendants jointly and severally in the sum of $1,038,220. Thereafter, under protest

and upon stipulation that the same would be without prejudice to the appeal, all of the bonds and coupons were delivered to the clerk with the exception of coupons amounting to $81,303.75. On March 24, 1933, a second judgment was entered against said defendants jointly and severally for said sum of $81,303.75. As to the defendants Watterson, the judgments have become final. The executors of the estate of Crowell, W. D. Longyear, M. H. Lewis & Company, M. H. Lewis, and C. A. Sheedy have appealed from both judgments upon one record.

The case is founded upon the provisions of section 58 of the Irrigation District Act (Act 3854, Deering's Gen. Laws), which provides that no director or officers shall be interested, directly or indirectly, in any contract to be awarded by the board, and further provides that for a violation of such provision the officer shall be guilty of a misdemeanor and shall be punished by fine or imprisonment, or both.

This is not an action to have the issues of bonds declared invalid. Sections 68, 69 and 72 of the Irrigation District Act have to do with actions to contest the validity of bonds and to the time within which and the forum where such actions may be brought. It is provided thereby that such contest shall be in the nature of a proceeding *in rem;* that jurisdiction over the defendants may be acquired by special proceedings for publication of summons; provision is made for speedy trial, and for an appeal within 30 days. Section 72 provides that no contest of any of the matters in said sections provided for shall be made other than within the time and in the manner specified. Such sections have no application whatever to the present action, which is for legal and equitable relief consequent upon a void sale of valid bonds. This action is controlled, in respect to the place of trial and the time within which it must have been commenced, by the general provisions of the Code of Civil Procedure.

A considerable part of appellants' brief is devoted to argument of the proposition that the city has not come into the case with clean hands; that all relief ought to be denied it because of alleged unconscionable conduct in its dealings with the residents and landowners of Owens Valley. The findings of the court are to the contrary. Such findings

find ample support in the evidence, and upon well-recognized principles cannot be disturbed upon appeal.

Furthermore, to deny a litigant his day in court because of inequitable conduct, such conduct must have infected the cause of action and must relate to the transaction concerning which complaint is made. (21 C. J., sec. 173, p. 187; Pomeroy's Eq. Jur., 4th ed., vol. 1, sec. 399, p. 741; *Germo Mfg. Co.* v. *McClellan*, 107 Cal. App. 532 [290 Pac. 534].) There was an entire lack of evidence connecting plaintiffs with the sale of the bonds.

One of the principal points relied upon to overturn the judgments is the alleged fact that Crowell had no knowledge at the time of the transactions that the defendants Watterson were officers of the district. (It is admitted that all of the other defendants had such knowledge.) The evidence would support the following evidentiary findings: That Crowell had known both Wattersons for a good many years; that he often visited them in Owens Valley; that he knew they were prominent men there; that he had purchased mortgages from them, through their banks; that he had petitioned for the formation of the irrigation district; that W. W. Watterson told him the district had been formed and that there was to be a sale of the bonds in question and had tried to persuade him to buy the whole issue, which Crowell declined to do; that Wattersons, Longyear and Crowell persuaded M. H. Lewis & Company to make the bid; that Crowell finally agreed with W. W. Watterson to buy bonds to the amount of $118,000. Crowell further testified that W. W. Watterson said to him in that connection: ''Well, now, if we don't buy an interest in those ditches there, so that we can consolidate everything, . . . I think that *we* will disorganize this irrigation system, and *we* don't want these bonds sold out over the country, but *we* want them where *we* can call them in, place *our* hands on them and call them in, and *disorganize and pay off*. 'Well,' I says, 'that's all right.' 'Now,' he says, 'I've got Lewis over here to carry those bonds, what *you and me and Longyear hadn't taken*—I've got Lewis to carry them, and he will put them in a bank and carry them.' I says, 'I ain't going in any bank. I never borrowed any money from any bank on bonds or anything of the kind, and I'm not going to.' 'Well,' he says, 'I can arrange with Lewis to carry them and put them in the bank,' and I says,

'Well, all right.' I think about that time he came to me with an agreement that I would guarantee Lewis against any loss on those or something of the kind, and I signed the agreement; *thought nothing of it."* We have cited enough evidence to show that the finding of the court that Crowell had knowledge that W. W. Watterson was a director of the district is a justifiable inference and is, therefore, warranted. We need not pursue the matter further to establish knowl-edge that M. Q. Watterson was an officer of the district.

■ C. A. Sheedy, vice-president of the M. H. Lewis & Company, was present at the time of the opening of bids for the bonds, overheard the calling of the roll of directors on the question of accepting the bid of his company, and then learned that the deciding affirmative vote was cast by W. W. Watterson. This was notice to his company. In view of the knowledge of all appellants, including Crowell, of W. W. Watterson's connection with the district, it is not necessary to consider whether, in the making of the bid, M. H. Lewis & Company acted as the agent of the Wattersons, Longyear and Crowell, and thereby to charge the principals with the knowledge of the agreement, nor as to whether plaintiffs, by invoking the rules applicable to conspiracy, could charge Crowell with the knowledge of Sheedy.

■ Pursuant to the requirements of section 31 of the Irrigation District Act, the bonds bore the signature of W. W. Watterson, as president of the district. The parties to the contract of February 14, 1924, were chargeable with notice of all the facts disclosed upon the face of the bonds. (*Mc-Clure* v. *Township of Oxford,* 94 U. S. 429, 433 [24 L. Ed. 129]; *Crow* v. *Oxford,* 119 U. S. 215, 222, 224 [7 Sup. Ct. 180, 30 L. Ed. 388]; *Barnett* v. *Denison,* 145 U. S. 135, 139 [12 Sup. Ct. 819, 36 L. Ed. 652].)

■ The findings of the court as to defendant's knowledge of the whole transaction, including the Wattersons' official connections with the district, put at rest the whole of appellants' contentions arising from the claim that Crowell was a *bona fide* purchaser.

■ Appellants offered in evidence a letter dated December 26, 1924, purporting to have been signed by W. F. Mc-Clure, state engineer, addressed to the Governor of California, upon the subject of the controversy between the residents

and landowners in Owens Valley and the Department of Water and Power of the City of Los Angeles. It was based in part upon hearsay statements made to him. Upon objection that the letter was incompetent, being hearsay, and that no foundation was laid for its reception, it was excluded by the court. Reliance is placed upon the case of *Vallejo etc. R. R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545 [147 Pac. 238], wherein it was held that a report made pursuant to statute by the state agricultural society was admissible in evidence and contained legal evidence as to the facts therein stated regarding the products of the state. The offered letter was not shown to be an original; nor was it certified as a copy by any legal custodian thereof. There was no foundation for its reception in evidence. Aside from lack of foundation, it was not admissible. It was hearsay based upon hearsay and not such a report as is made legal evidence by any statute.

■ An important and surprising item of the evidence, around which much of the controversy turns, is a written contract bearing date February 14, 1924. The contract is between M. H. Lewis & Company, first party, and Watterson Brothers, Inc., W. D. Longyear and C. T. Crowell, second parties. The court found that the second page of the contract as produced by defendants was a true expression of the agreement of the parties, but that the first page thereof was not true or correct. The writing recited on the first page thereof that the first party *"has purchased"* the bonds in question (amounting to $471,500) at the instance and request of the second parties; that the first party would sell to the second parties, at the price paid therefor, one-half thereof; that neither Watterson Brothers, Inc., nor Longyear should profit by the transaction. On the second page it provides that the second parties agreed to save the first party harmless from any loss by reason of the purchase and sale of said bonds; that "said second parties agree that at the time of the purchase of said bonds above described, and during the term of this agreement, they *will* make and maintain satisfactory banking agreements for carrying said bonds on loans, or otherwise, for said first party during the period of this agreement, and incidental to said loans, will agree to furnish any necessary margin required in carrying said bonds". All of said terms were proved by satisfactory evidence aside from the contents of the instrument itself and are admitted, except

the provision that neither Watterson Brothers, Inc., nor Longyear should profit. This latter provision, contained on the first page of the contract, is relied upon by appellants to clear the transaction of its fraudulent aspects. Throughout the argument of the sufficiency of the evidence to justify the findings of the court, appellants repeatedly resort to said passage to exonerate the appellants of wrongdoing. The complete answer is that the findings are to the effect that said provision was not part of the contract actually made. Italics have been employed to show that the first page of the agreement was rewritten, apparently, after the purchase,. because it recites that the first party *has purchased;* whereas, the second page contains an agreement to the effect that the second parties *will* make the banking agreements referred to. It is evident from an inspection of the photostatic copy of the agreement that the two pages were written on different typewriters; and perforations disclose that the pages had previously been fastened together in some instrument and thereafter torn apart. An original draft of the agreement prepared by Lewis was not produced; nor was the first typed draft thereof, though Lewis testified it was prepared by an attorney then representing Mr. Longyear. Said contract was attached as an exhibit to the answer of the defendant M. H. Lewis & Company, filed March 3, 1926. Appellants contend that plaintiffs were not in a position to deny its genuineness and due execution owing to their failure to follow the requirements of section 448 of the Code of Civil Procedure.

*Heath* v. *Lent,* 1 Cal. 410, was a suit against an administrator of an estate upon a bond executed by the deceased as surety. While the statute then in effect was somewhat different from section 448 of the Code of Civil Procedure, the statements of the court are helpful as indicating the reason for the rule found in such statutes. There the court said: "The statute provides, that when a complaint or answer is founded on an instrument in writing, which is alleged to have been signed by the party, the signature shall be considered as admitted, unless denied by such party on oath. The party to be charged was the representative of the estate of the person whose signature appears on the bond. He had not signed the instrument, and could not deny upon oath its execution by the deceased. It is clear that the statute does not extend to any other parties than those who are alleged

to have signed the instrument. Such parties are supposed to know the genuineness of their own signatures, but it would be unreasonable to suppose that the representatives of a deceased party possess the same knowledge.''

In *Marx* v. *Raley & Co.,* 6 Cal. App. 479 [92 Pac. 519], the action was for the value of personal property sold. Defendant set up a letter written by it to plaintiff's assignor, claiming that the contract was embodied therein. After citing with approval *Heath* v. *Lent, supra,* the court said: ''In this case, as in that, it would be unreasonable to say that the plaintiff was bound to know the genuineness of the signature of the defendant.''

*Miller* v. *Price,* 103 Cal. App. 650 [284 Pac. 1035], was an action for damages for wrongful levy of an execution. The defendant set up in his answer a copy of his instructions given to the sheriff in the prior suit and the sheriff's return. Plaintiff did not deny the genuineness nor due execution of such documents by affidavit. Defendants relied upon the code section in question. The court said: ''Such papers are binding only upon the parties who have signed the same.''

On the other side of the question, we have *Krug* v. *Warden,* 57 Cal. App. 563 [207 Pac. 696]. That was an action to quiet title. An intervener set up a tax deed to Warden and a quitclaim deed from Warden to intervener. There it was contended that plaintiff's failure to comply with section 448 of the Code of Civil Procedure prevented his attack upon the tax deed upon the ground it was void. The court said: ''Plaintiff could not deny that the deeds had been assigned (signed?) by the purported parties or delivered. It was admissible, however, for him to prove that the conveyance to Warden was void. This he did by showing the insufficiency of the notices . . . '' Inasmuch as the case turned upon a holding that the deed was void, it is not directly in point on the question here involved. A similar situation is disclosed in the case of *Interstate Realty etc. Co.* v. *Clark,* 77 Cal. App. 558 [247 Pac. 244].

Without attempting to formulate from said decisions a rule of general application, we hold that section 448 of the Code of Civil Procedure cannot be applied in this case to prevent the plaintiff from impeaching the genuineness of the pleaded contract. Plaintiffs were not parties to the contract, nor in any way privy thereto. As we see it, the reason behind the

rule is not present here; and, the reason failing, the rule fails of application. The first page of the contract being impeached, and the finding of the court being that said page was not true or correct, said recital that the Wattersons and Longyear should not profit, added strength to the claim of illegality made by plaintiffs in their pleadings. The contract was merely an item of evidence, all of the terms of which, with the exception of the one now under consideration, supported plaintiff's position.

In any event, the only material effect of an admission of the terms of the contract would be to entitle defendants to avail themselves of the contention that the Wattersons and Longyear did not profit from the sale of the bonds. In other respects the findings of the court as to the terms of the actual agreement between the parties to the purchase of said bonds are not challenged. If defendants had established the contract to be that the Wattersons did not profit by the sale, that fact would not necessarily establish a lack of interest on their part in the contract. Under such circumstances the validity of the contract does not hinge upon whether the fiduciary did or did not profit. (*Henninger* v. *Heald*, 52 N. J. Eq. 431 [29 Atl. 190]; *Menefee* v. *Oxnam*, 42 Cal. App. 81, 88 [183 Pac. 379]; *Western States L. Ins. Co.* v. *Lockwood*, 166 Cal. 185 [135 Pac. 496].)

Whether defendants Watterson profited or not, it is an undoubted fact that in contemplation of law they suffered a detriment by the assumption of the obligations of said contract.

On the question of whether the Wattersons were interested in the sale in contravention of section 58 of the Irrigation District Act, it should be stated here that the evidence disclosed that the Wattersons actually acquired one-eighth of the bonds purchased in the name of Lewis & Company, for a sum in excess of $52,000, and that said bonds so acquired were subsequenty sold by them to the defendant Crowell. The evidence was abundant to support the finding of a direct interest of the defendants Watterson in the sale. The indemnifying agreement made by them, Longyear and Crowell, as second parties, with M. H. Lewis & Company, as first parties, under which the second parties had the right to acquire one-half of the bonds at the price paid, the actual acquisition of one-half thereof by said second parties and

the procuring by the Wattersons of one-eighth thereof pursuant thereto, put the matter beyond controversy. The interest was such as is denounced by section 58 of the Irrigation District Act.

It is not true, as is contended, that even if it be 'held that the Wattersons were interested in the purchase, such interest would operate to invalidate only the sale of the bonds which they acquired. "It is established by an unbroken line of authorities that 'where a statute provides a penalty for an act, a contract founded on such act is void, although the statute does not pronounce it void, nor expressly prohibit it'." (*Stockton P. & S. Co.* v. *Wheeler,* 68 Cal. App. 592, 601 [229 Pac. 1020]; *Berka* v. *Woodward,* 125 Cal. 119, 127 [57 Pac. 777, 73 Am. St. Rep. 31, 45 L. R. A. 420]; *County of Shasta* v. *Moody,* 90 Cal. App. 519, 523 [265 Pac. 1032]; *Moody* v. *Shuffleton,* 203 Cal. 100 [262 Pac. 1095].)

Appellants contend that certain curative statutes passed by the legislature operate to validate the sale. Such acts of the legislature are found in Statutes of 1925, page 373; Statutes of 1931, page 376; Statutes of 1933, page 572. In almost identical language such statutes provide that all proceedings leading up to the sale of bonds of irrigation districts theretofore sold are legalized, ratified, confirmed and validated; the bonds are declared to be binding obligations of the district issuing them; and the faith and credit of the district are pledged for their payment.

It seems that the instances in which such statutes are most frequently applied are where there has been an entire failure to follow the procedure specified in a statute, where there has been an irregular or defective compliance with such procedure, and where proceedings have been taken in the absence of any legislative authority. All such instances of the application of such statutes may be passed over without further notice for the reason that, though enlightening on the general subject, our problem is not to be determined thereby. The question here is whether the comprehensive language employed in the validating acts is properly applicable to cure a fraud such as was found to have been committed.

The cases where the courts have passed upon the question are few. One of them is *Thompson* v. *Thompson,* 52 Cal. 154. There certain land was conveyed to the city of Santa Barbara and was later transferred to Espinosa, who took the convey-

ance for De la Guerra, the president of the board of trustees of the city. The action was ejectment by a grantee of De la Guerra against defendant who claimed title by a prior grant from the municipal authorities. Defendant proved only, however, that he had enclosed the land in 1859, and had subsequently occupied the same. The case turned in part upon a holding that if the defendant "had no privity with the title of the town, he was not in a position to institute an inquiry whether the grant to Espinosa was for his own benefit, or that of De la Guerra". The decision contains the following language applicable here: "If there was any infirmity in the deed from the town authorities to Espinosa, for want of authority or legal capacity to make it, the defect was cured by the third section of the act of February 6, 1872 (Stats. 1871–2, p. 78), which enacts that 'all acts and proceedings of the board of trustees of the said town . . . are hereby approved and confirmed'. . . . A subsequent approval by the legislature of a prior disposition of the land by the town authorities, was equivalent, in law, to a previous authority so to dispose of them." The Thompson case was considered in *City of Oakland* v. *Oakland Water Front Co.,* 118 Cal. 160, at 194 [50 Pac. 277], in which it was stated, concerning it, that the act there in question confirmed " 'all the acts and proceedings' of the trustees—a confirmation as comprehensive and universal as it could possibly be made. No construction of the language of that act could have excluded the transfer which it was held to have validated, . . . " Thus, it is said by appellants that it is shown that the curative statute was given effect notwithstanding the showing of fraud on the part of De la Guerra. It must be acknowledged that said case of *Thompson* v. *Thompson, supra,* turns in part upon the curative effect of the statute and to that extent supports appellants' position. We may here quote other language of Chief Justice Beatty in the case of *Oakland* v. *Oakland Water Front Co., supra,* which is appropriate: "It is to be regretted, . . . that a court should ever feel itself bound by rules of construction to give effect to statutes which ratify and confirm by wholesale the acts of municipal or other political agencies of the state. There is no more reckless or dangerous species of legislation. It is really legislating with the eyes shut, . . . " On a similar subject, the Supreme Court of the United States stated: "If the legislature intended to do what

is claimed, 'it was bound to do it openly, intelligibly, and in language not to be misunderstood', and, 'as a doubtful or obscure declaration would not be justifiable, so it is not to be imputed'.'' (*Hayes* v. *Holly Springs,* 114 U. S. 120, at 126 [5 Sup. Ct. 785, 29 L. Ed. 81].)

The action of *Spear* v. *City of Bremerton* was before the Supreme Court of Washington on three occasions and is reported in 90 Wash. 507 [156 Pac. 825], 93 Wash. 699 [160 Pac. 946], and 95 Wash. 264 [163 Pac. 741]. The city of Bremerton, without authority, undertook to purchase and operate a water system lying partly within the territorial limits of another municipality. Municipal bonds were issued to provide funds to purchase the system from a private water company. An attack upon the validity of the bonds because of the lack of authority to make the purchase was sustained in the trial court but, pending appeal, a validating act conferred authority upon the municipality to make the purchase and, accordingly, such act was held to have cured the lack of legislative authority. There was a second ground of attack upon the bonds to the effect that their sale was fraudulent in that the city officials disposing of them connived with bond brokers to sell the bonds at a discount, and that this was accomplished by the pretense of paying certain commissions, attorney's fees, etc. This attack was sustained by the Supreme Court in the final decision, the court holding in this particular: ''It is not to be understood that we approve the original judgment in so far as it sanctioned the attempt of the city of Bremerton to pay John E. Price & Co. or any purchaser a sum in lieu of interest under the guise or subterfuge of a commission, attorneys' fees, or other pretense. In that respect the judgment from which this appeal is taken will be *affirmed.*''

The case of *Mayor of City of New York* v. *Tenth Nat. Bank,* 111 N. Y. 446 [18 N. E. 618], involved fraud on the part of commissioners of the city, who appropriated a part of the funds advanced by the bank for the construction of a courthouse. Such commissioners were also directors of the bank making the advances but did not represent it in the transaction, their only activity therein being in behalf of the city. The curative act ratified the advances made and bonds issued to raise money for their repayment. While there was fraud in the case, it was not on the side of the bank. The bank

acted only through its president, who acted in good faith and in entire ignorance of any fraud. The case, therefore, is not in point.

In *White Mountains R. R.* v. *White Mountains R. R.,* 50 N. H. 50, the properties of the railroad were being sold under the terms of a mortgage given to secure outstanding bonds. A group of bondholders agreed among themselves to bid in the property at the trustee's sale and connived with the trustee, offering and delivering to such trustee stock in a corporation (thereafter formed to operate the railroad) as consideration for such trustee's efforts in securing a disposition of the property at a low figure. The sale was consummated according to the agreement and thereafter the trustee received a certificate of stock in the new company. The action was to set aside the sale on the ground of fraud. One of the defenses was that the sale had been validated by legislative act. In disposing of the matter the court said: "It would not be unreasonable to presume that the legislature were ignorant of the fraudulent character of the sale, and, by confirming the sale, intended only to relieve the purchasers from the consequences of mistakes or formal defects. But whatever knowledge or intention they may have had, the statute cannot operate to prevent the plaintiffs from invalidating the sale by proof of fraud. Such a result is beyond the power of the legislature. It does not come within the principle of that class of cases (decided in other states) in which a legislature has been held to have the power to confirm, by retroactive laws, the acts of public officers who have exceeded or imperfectly executed their authority; or to cure defects in conveyances. Statutes of this kind 'are of a purely remedial nature'; their purpose being to correct mistakes in order that the intention of the parties may be carried out. The legal rights affected by such statutes are 'deemed to have been vested subject to the equity existing against them'; and the statutes accomplish only what, upon principles of natural justice, a court of equity ought to have power to decree. Such legislation has been held valid 'when clearly just and reasonable, and conducive to the general welfare'; 'but the cases', says Chancellor Kent, 'cannot be extended beyond the circumstances on which they repose without putting in jeopardy the energy and safety of the general principles'. (1 Kent's Com. 456.) In this instance the statute of 1859, if it cures

the fraud in the sale, goes far beyond the correction of mistakes, or the remedying of formal defects; and is not only open to objection as a retrospective law, but also as an act of a judicial nature. Could the legislature before the sale have passed an act authorizing one of the trustees to receive a bribe from the purchasers? If not, how can their subsequent confirmation have greater efficacy than their previous authorization? 'The healing statute must in all cases be confined to validating acts which the legislature might previously have authorized. It cannot make good retrospectively, acts which it had previously no power to permit.' "

The recent decision of *Meyerfeld* v. *South San Joaquin Irr. Dist.*, 3 Cal. (2d) 409 [45 Pac. (2d) 321], involves a consideration of the curative act of 1931 already referred to. While the question of fraud was not involved, it is there stated: "The answer of the intervener urges with much merit that it is obvious from a reading of the ratifying statute that it was the purpose of the legislature thereby to cure the irregular exercise of power and not to validate an antecedent act attempted in the total absence of power."

Appellants' strongest statement of their position is that it would have been lawful for the legislature to have provided that an officer of an irrigation district might become a bidder at such a bond sale and that, if his bid were the best, he might become a purchaser; that, the legislature having had the authority so to enact, a sale in which a director was interested can be ratified by subsequent legislative act. The question raises the concept of a retrospective, implied repeal of the penal statute. A ratification by curative act in this case would operate to validate an act utterly void when done because prohibited by law and made a crime. If we grant that it is the general rule that the legislature may ratify an act which it could have authorized, such rule will not be applied where to do so is not only to ratify a fraud but to ignore an applicable penal statute. So far as we know, no case has ever gone so far. There is no clear showing that the legislature intended such a result; and, since the legislature has not gone to that length, the court is not permitted to do so.

It is contended by appellants that, upon an application of the maxim "he who seeks equity must do equity", the court should have ordered as a condition to the delivery of the

bonds that the district pay to M. H. Lewis & Company the money paid upon the purchase. It is admitted that under the authority of *Sechrist* v. *Rialto Irr. Dist.*, 129 Cal. 640 [62 Pac. 261], plaintiffs could not be held to the necessity of making the payment.

The check for $8,400, constituting the original payment, accompanied the bid and was delivered to the secretary of the district. Upon acceptance of the bid it was turned over by the assistant secretary to the treasurer. The checks aggregating $411,999.78 never did reach the hands of any officer of the district except the Wattersons, as already indicated. However, a receipt was given the assistant secretary by the treasurer for $420,399.78. Entries were made in his books by the treasurer, and a resolution was adopted by the board of directors, wherein it was recited that the money had been received by the district. The whole of the payment of $411,999.78 was deposited in Los Angeles and San Francisco banks to the credit of Wattersons' banks, either the Inyo County Bank or the First National Bank of Bishop, on or about February 15, 1924. No part of the money was deposited to the district's credit in any bank. The finding that the district did not receive any part of the $420,399.78 is supported by the evidence; and it is established that the misappropriation was on or about February 15, 1924. The only indefiniteness about the findings is that "practically all" of the money was converted by the Wattersons to their own use. This did not imply that the district got any part thereof.

It is conceded by the respondents that payments made by checks payable to the treasurer, and delivered in the ordinary course of business, would constitute payment to the district. We think the form of the payments is not of much importance as against the agreement and conditions under which they were made. A competent majority of the board of directors did not accept the bid; therefore there was no acceptance. (*Curtin* v. *Salmon River etc. Co.*, 130 Cal. 345 [62 Pac. 552, 80 Am. St. Rep. 132]; *North Confidence M. & D. Co.* v. *Fitch*, 58 Cal. App. 329 [208 Pac. 328].) The action was no more effectual to bind the district than as if the board had voted to reject the bid. If the board had voted to reject, there would have been no change in title to the money; so here, the district did not become entitled to the money nor to any

part of it. Of course, if the district had taken the money notwithstanding there was no contract, it would be required to deliver it up. When the money was misappropriated it still belonged to the bidders and those whom the bidders represented. But, however that may be, we may warrantably hold the district not liable to pay appellants anything. Equity will not permit its rules to be made instruments of injustice. If natural justice makes no demands upon the district, the rules of the court of equity make none. The maxim that "he who seeks equity must come with clean hands" sometimes outweighs the other maxim that "he who seeks equity must do equity". (*Goble* v. *O'Connor,* 43 Neb. 49 [61 N. W. 131].) As between the appellants and the innocent district, under the facts disclosed by the record in this case we think justice requires that the loss should fall upon the appellants. In truth, as we see it equity has no claim whatever on the district. It was not required to pay to the purchasers any money as a condition to the successful maintenance of the action.

Section 72 of the Irrigation District Act provides merely that in any *such* action (namely, an action to contest the validity of the bonds), all findings of fact or conclusions of the board of directors shall be conclusive. Such provision has no application here to bind the court to the effect that the district got the money.

We see no merit in the point that the court had no jurisdiction to enter the second judgment, or that it was in any way erroneous. The first judgment was interlocutory in form and is such a judgment as is well recognized in suits in equity. It was well adapted in its provisions to meet the necessities of the case. The final judgment was strictly pursuant to the first judgment.

The judgments are affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 6, 1935.