[Civ. No. 21982. First Dist., Div. Two. Mar. 17, 1965.]

BENIAMINO BUFANO, Plaintiff and Appellant, v. THE CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant.

Vincent Hallinan, Carl B. Shapiro, and Patrick Sarsfield Hallinan for Plaintiff and Appellant.

Thomas M. O'Connor, City Attorney, and William E. Mullins, Deputy City Attorney, for Defendant and Appellant.

TAYLOR, J.—On February 1, 1962, plaintiff filed this action against the City and County of San Francisco (hereafter referred to as City) for the conversion of two granite sculptures. The City alleged that his action was barred by the statute of limitations (Code Civ. Proc., §§ 335, 338) as the conversion occurred in 1942 when the City acquired the sculptures. After a jury verdict in favor of plaintiff, the trial court granted the City's motion for a judgment notwithstanding the verdict and denied its motion for a new trial. Plaintiff appeals from the judgment notwithstanding the verdict and the City cross-appeals from the judgment rendered on the verdict.

### I. Plaintiff's Appeal from the Judgment Notwithstanding the Verdict.

Viewing the record in the light most advantageous to plaintiff, as we must, the facts are as follows: Plaintiff, Beniamino Bufano, a renowned artist of world-wide reputation, created the two pieces of sculpture that are the subject of this action: a silver-grey granite female torso, weighing three-quarters of a ton to one ton, hereafter referred to as Torso, and an incomplete 8½-ton black California granite

bear, hereafter referred to as Bear. Torso was carved from a stone acquired by plaintiff around 1920 and completed several years later; Bear was only roughly sketched out on a stone acquired by plaintiff around 1925.

From about 1937 to 1941, plaintiff was employed as a sculptor and supervising instructor by the Works Progress Administration of the federal government, hereafter called the WPA. The WPA was a federal unemployment relief agency that provided employment through the operation of various projects sponsored by local political entities. Only works requested by the public entities could be produced under the auspices of WPA projects. WPA provided the funds for the salaries of the artists and also provided the tools, materials and studios if the various requesting agencies were unable to provide such assistance. All of the products of the local operation were owned by the local sponsor. During the time he was employed by WPA, plaintiff worked and supervised the work of other sculptors in the WPA San Francisco art project at a studio rented by WPA for this purpose at 15th and Shotwell Streets, San Francisco. Because WPA was primarily an unemployment relief agency, all of its employees were limited to working only a specific number of hours. Thus, plaintiff and others could work only part time on the publicly sponsored WPA sculptures and they had additional time for their individual pursuits.

By about 1938, plaintiff had completed for WPA the granite and stainless steel likeness of Sun Yat-sen for St. Mary's Square. The WPA art project also approved the execution of a large number of pieces of sculpture for the City and County of San Francisco to be placed in the proposed Aquatic Park project. By November 1941 thirteen of these had been finished. The Aquatic Park project was never completed in accordance with the original plans and the sculptures were not used there, but they were subsequently placed in various public locations throughout the City. While the evidence is conflicting, there was testimony that Torso was not included in a list of works for Aquatic Park. Bear was not one of the pieces made for the WPA project.

In 1939 or 1940, Torso, which had been completed long before plaintiff's association with WPA, was lent by him to WPA for several exhibitions. After these exhibitions and because plaintiff did not have a studio of his own, Torso was stored in the Shotwell Street studio, along with plaintiff's tools, other pieces of sculpture and materials, including the

incomplete Bear here in issue. Plaintiff's Statue of Peace, started about 1935 on a commission for the San Francisco World's Fair, was also in the Shotwell Street studio after the exhibition. Plaintiff never gave either Torso or Bear to WPA; WPA never claimed either.

Around 1941, apparently because of certain matters not relevant to this action, plaintiff was locked out of the WPA studio in San Francisco but continued to work at other WPA art project studios. After the beginning of the second World War, WPA was terminated and had to dissolve its various art projects as rapidly as possible. In 1942, all items (sculptures, tools, uncut stones) in the Shotwell Street studio were turned over to the City by WPA and moved by the City to its Clarendon Street yard. Among the many items so turned over was the personal property of the various individuals who had been working at the Shotwell Street studio. The City listed Torso and Bear on its receipt issued July 9, 1942, and the City's art commission approved the allocation by resolution passed on October 7, 1942. At this time, plaintiff was in Washington, D. C. with the National Youth Administration.

In 1944, Torso was exhibited in the Civic Center as part of an exhibition of WPA art works for the organizational meeting of the United Nations. This exhibit bore a sign to the effect that the items therein were the property of the City and County of San Francisco.[1] Although plaintiff was then a member of the City's art commission, which initiated the exhibit, he had nothing to do with the sign, which was prepared by Mr. Kline, then the Executive Assistant to the City's Chief Administrative Officer, Mr. Brooks. There was no evidence that plaintiff saw the sign and he testified that he had no recollection that there was such a sign. There was

---

[1] "These granite sculptures are the property of the City and County of San Francisco.

"They were produced by the Northern California Art Project of the Works Progress Administration, under the supervision of Beniamino Bufano, sculptor, as artist. The project was sponsored by the City and County.

"War conditions caused the project to be closed down before all the pieces were completed with bases.

"These sculptures have been placed on public display at the request of the Board of Supervisors and with permission of the Park Commission. The Board's request was contained in Resolution No. 4262, adopted Oct. 9, 1944, and approved by Mayor Roger D. Lapham Oct. 11, 1944.

"Anyone causing damage to any of these works will be subject to penalties of the law.

"Chief Administrative Officer."

evidence that one-third of the objects on exhibit were on loan to the City.

Subsequently, the art commission attempted to place some of the items from the exhibit near the Legion of Honor but this was disapproved by the other public agencies concerned. At its regular meeting of November 8, 1944, the art commission, with plaintiff in attendance as a member, directed its secretary to write to Mr. Brooks and ask about the procedure for the disposal of the various art objects allocated to the City from WPA. By unanimous decision, a special meeting was called on this matter for November 27, 1944.

Although the minutes of the November 27, 1944, meeting indicate that plaintiff was present, and that a letter from Mr. Brooks was read declaring that the property belonged to the City and listing several finished pieces, including Torso, plaintiff testified that there was never any question as to his ownership of Torso and that he did not recall the reading of the Brooks letter at the commission meeting. He further testified that the commissioners would go in and out of the room and that it was possible that the letter could have been read while he was not present.

In 1945, the City's board of supervisors by resolution authorized the loan of several pieces of sculpture including Torso to the City housing authority for five years. The items subject to this agreement were delivered to the housing authority but two pieces, Torso and Peace, were later returned to the City's yard at 15th and Harrison Streets. In 1946, the board of supervisors by resolution authorized the destruction of some of the art property allocated to the City by WPA in 1942. Torso, however, was not so destroyed and apparently remained at the City's yard at 15th and Harrison Streets.

In 1950, James E. Leary, the City's Stores and Equipment Supervisor who was in charge of the yard at 15th and Harrison Streets, compiled a list of all the pieces of sculpture which the City had been allocated by WPA, including Torso and Bear. At this time, Torso was still in the City's yard at 15th and Harrison Streets, while Bear was at the Clarendon Street yard. Sometime in 1951 or 1952, at the request of the art commission, a survey of the City's art objects was undertaken. Torso and Bear were listed as items 630 and 633, respectively, and were still at their respective Harrison Street and Clarendon Street locations.

In 1954, at the direction of Mr. Brooks, Mr. Duckel, the Assistant Engineer of the City, moved Bear to the City's

Southeast Sewage Treatment Plant. Thereafter, both Torso and Bear were moved to the dump. In 1959, the City library commission asked Duckel for permission to display Torso at one of its branch libraries. Subsequently, Duckel, through Mr. Owens, the Director of Public Works, had Torso and Bear and some of the other art property allocated by WPA moved from the dump to the North Point Sewage Treatment Plant. Duckel then ordered that none of the items so moved to the sewage treatment plant were to be released to anyone except on order of the Director of Public Works through the Purchaser of Supplies.

Among the pieces of sculpture moved to the North Point Sewage Treatment Plant was plaintiff's "Peace" or "Mother of Races." Duckel permitted plaintiff to enter the North Point Sewage Treatment Plant in order to put "Peace" into condition for a display requested by Grace Cathedral. After the Grace Cathedral exhibit, "Peace" was returned to the sewage treatment plant. Subsequently, "Peace" was given to the City and installed at the San Francisco Airport. Duckel then discovered that plaintiff was working at the North Point Sewage Treatment Plant. He was temporarily shut out, but in January 1961 the board of supervisors passed a resolution allowing plaintiff access to the garage of the North Point Sewage Treatment Plant to complete Bear and several other pieces.

Because the language of the 1961 resolution of the board of supervisors indicated that the benefit of plaintiff's work would "inure to the . . . City," plaintiff became concerned that the City was asserting ownership in his pieces of sculpture. In 1961 Owens, the Director of Public Works, talked to plaintiff and his attorney about the property acquired by the City from WPA. By letter of August 10, 1961, Owens advised them that the City owned all of the property acquired from WPA.

After his oral request for the return of Torso and Bear was denied, plaintiff filed a verified claim with the city controller on January 19, 1962, and filed his complaint in this action on February 1, 1962. Thereafter, without the knowledge of plaintiff, Torso was moved by the City to the Visitacion Valley Public Library. At the time of the trial, Torso was still in the Visitacion Valley Public Library; Bear was at the North Point Sewage Treatment Plant.

Plaintiff admitted that he knew the City had obtained possession of Torso and Bear from WPA in 1942; that between

1942-1961, he did not request their return as he was busy with his other work and thought the City was taking care of things; that he claimed ownership only of Torso and Bear. There was evidence that at its DeYoung Museum, the City had many valuable paintings and art objects on loan but returnable to their owners on demand and that some of these items had been in the museum for about 50 years; that the various sculptures executed by plaintiff for WPA in 1945 and loaned by the City to the housing authority for a five-year period, were still on loan to the housing authority 13 years after the expiration of the original five-year period.

 A motion for a judgment notwithstanding the verdict may properly be granted only when, disregarding conflicting evidence and indulging in every legitimate inference which may be drawn from plaintiff's evidence, the result is a determination that there is no evidence sufficiently substantial to support the verdict. On appeal, we must read the record in the light most advantageous to plaintiff, resolve all conflicts in his favor and give him the benefit of every fact pertinent to the issues involved and which may reasonably be deduced from the evidence (*Conner* v. *Utah Constr. & Mining Co.*, 231 Cal.App.2d 263 [41 Cal.Rptr. 728]).

We discuss briefly the meaning of conversion, which is the basis of plaintiff's complaint. It has been broadly defined as any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights thereto (*Gruber* v. *Pacific States Sav. & Loan Co.*, 13 Cal.2d 144 [88 P.2d 137]). Neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance are the gist of the action (*Poggi* v. *Scott*, 167 Cal. 372 at p. 375 [139 P. 815, 51 L.R.A. N.S. 925]). It is not necessary that there be a manual taking of the property. Any unwarranted assumption of authority over chattels, inconsistent with another's right of possession or subversive of his vested interest therein amounts to conversion (*McCaffey Canning Co.* v. *Bank of America*, 109 Cal.App. 415 [294 P. 45]; *Pilch* v. *Milikin*, 200 Cal.App.2d 212, 224 [19 Cal.Rptr. 334]). Conversion is an action at law subject to jury determination (*Central Bank* v. *Superior Court*, 45 Cal.2d 10, 19 [285 P.2d 906]).

. We first consider whether the City had title to the sculptures before the WPA allocation in 1942. If, as the City asserts, Torso and Bear were among the items created by plaintiff for WPA, or if WPA had converted them to its own use,

then the City, as local sponsor of the art project, acquired title even before it acquired possession.

▇ The uncontroverted evidence established that the granite for both Bear and Torso was purchased by plaintiff with his own funds in the 1920's, that Torso was completed by plaintiff long before his association with WPA and that he did not work on either Torso or Bear under the WPA project. There was additional evidence that plaintiff lent Torso to WPA for exhibitions and that it was then returned to the Shotwell Street studio along with plaintiff's other works, as he then had no studio of his own. The conflicting evidence as to whether Torso was one of the items included in the proposed, but never completed, Aquatic Park project must be viewed in favor of plaintiff. There was testimony that plaintiff never gave the sculptures to WPA and that WPA never asserted claim to them. The mere fact that plaintiff's work in the Shotwell Street studio was terminated by the WPA project in 1941 would not, as a matter of law, constitute a conversion of his personal possessions located therein. Thus, there was ample evidence to support the conclusion that the City did not have any title to either Torso or Bear before 1942.

▇ We next turn to the City's argument that there was a conversion in 1942 when it complied with its charter provisions by having its art commission pass a resolution accepting the project works, including Torso and Bear, from WPA and that the three-year statute of limitations having run from that date, neither plaintiff's claim nor his complaint against the City was timely filed.[2]

There was a close identification between the City and its WPA art project. While WPA was a federal unemployment agency, its projects were conducted under the auspices of local communities. The WPA art project was sponsored by the City. The City determined what works were to be produced. The sponsoring agency, if possible, was to provide material and the place of operation. All products of local WPA projects were owned by the sponsoring agency. Under these circumstances and because the art project was a cooperative venture of the City and WPA, it is reasonable to conclude that the City's resolution accepting the art works, when its WPA project was dissolved, was a mere formality

---

[2]Section 338 of the Code of Civil Procedure provides that an action for the recovery of personal property shall be commenced within three years after the accrual of the cause of action.

rather than a purposeful and unlawful exercise of dominion over privately-owned items mistakenly listed by WPA officials. The jury could justifiably find that the receipt of Torso and Bear by the City in 1942 did not constitute a conversion. Certainly we are not prepared to hold that there was a conversion as a matter of law.

By permitting Bear and Torso to remain in its studio, the WPA project became a gratuitous bailee (Civ. Code, § 1847). When the City received and stored these sculptures after the project's dissolution, its custody can be viewed as merely an extension of that of its own WPA art project and it was normal for plaintiff to so regard it (*Esponda* v. *Kelly*, 57 Cal.App. 766 [207 P. 939]). Thus, the formal assumption of control by resolution did not terminate the bailment.

There is no conversion and the statute of limitations does not start to run against an owner of property and in favor of a bailee until the bailee's adverse claim is brought to the owner's knowledge (7 Cal.Jur.2d § 24, pp. 659, 660). Where an original taking is wrongful, the bar of the statute runs from the time of the unlawful taking, but where the original taking is lawful, the statute is not set in motion until the return of the property has been demanded and refused or until a repudiation of the owner's title is clearly and unequivocally brought to his attention (*Martin* v. *Bank of America*, 4 Cal.App.2d 431, 436 [41 P.2d 200]; *Niiya* v. *Goto*, 181 Cal.App.2d 682 [5 Cal.Rptr. 642]; *Reed* v. *Molony*, 38 Cal.App.2d 405, 411 [101 P.2d 175]). The City art commission's 1942 resolution would not itself constitute such notice as there was no testimony that plaintiff had knowledge of its passage.

The next question is whether at any time after 1942, the City asserted such dominion over Torso and Bear to the exclusion and in defiance of plaintiff's right that his cause of action accrued before 1961. Plaintiff testified that the City never claimed ownership of Torso or Bear until its refusal to return them to him after his 1961 request.

As to the reading of Mr. Brooks' letter before the art commission in 1944, plaintiff's testimony that he did not recall it and that he may have been out of the room when it was read must be given credence on this appeal. Since the letter was of vital concern to plaintiff, he undoubtedly would have heard it read and remembered it had he been present. Thus, his asserted inability to recall because of his absence

is not only a reasonable explanation but is tantamount to a direct denial. Similarly, it was not shown that the placing of the sign at the 1944 Civic Center exhibition proclaiming the City's ownership was the responsibility of plaintiff, who testified that one-third of the items exhibited were on loan to the City, that there was no dispute concerning his ownership of Torso and further that he had no recollection of having seen such a sign.

The fact that the City in 1961 permitted plaintiff to work on Bear and several of his other sculptures on City property was entirely consistent with his consent to the City's possession. Plaintiff's lack of concern about Torso and Bear for a long period of time, because he was busy with his other work and knew the City had them and assumed it was taking care of them, is entirely consistent with the evidence adduced concerning other long-time loans of works of art, as well as with the size and bulk of Torso and Bear.

The City argues that it acquired title to Torso and Bear by adverse possession. While we note that the application of section 1007 of the Civil Code to personal property is not as well established as the City contends (*San Francisco Credit Clearing House* v. *Wells,* 196 Cal. 701 [239 P. 319]. and see 14 Cal.L.Rev. 218; 13 Cal.L.Rev. 256; 3 Am.Jur.2d § 202, pp. 291-293), we need not meet this issue as there was insufficient evidence of any hostility on the part of the City.

We conclude that, viewing the record most favorably to plaintiff, there is sufficient substantial evidence that the City did not assert its ownership in Torso and Bear until 1961, and that his claim and subsequent complaint for conversion were timely filed. Thus, the judgment notwithstanding the verdict must be reversed.

## II. The City's Appeal From the Judgment Rendered on the Verdict in Favor of Plaintiff.

On this appeal, the City argues that the judgment must be reversed because of: 1) the insufficiency of the evidence; 2) the exclusion of certain evidence; 3) the prejudicial misconduct of plaintiff's attorney; and 4) certain errors and omissions in the instructions to the jury.

Our detailed discussion of the evidence in relation to the judgment notwithstanding the verdict obviates the necessity for any discussion of the sufficiency of the evidence here except as it relates to the amount of damages awarded to plaintiff. The jury returned a verdict of $50,000. Although

there was evidence that plaintiff had refused to sell any of his sculptures, a number of his experts evaluated Torso and Bear at about $30,000-$45,000 each. The City offered no evidence to the contrary.

The City argues that the court's exclusion of certain evidence constituted reversible error. The record indicates that in order to show that whatever personal property plaintiff left with WPA had been returned to him, the City offered a certain letter from an official of the WPA identified as part of the file of the City's Chief Administrative Officer. The City also offered a file of correspondence concerning the permission granted plaintiff by the board of supervisors to work at the North Point Sewage Treatment Plant. The trial court sustained plaintiff's hearsay objections to these items and the City made no effort to show that either item was not hearsay or that either fell within the provisions of the Uniform Business Records as Evidence Act (Code Civ. Proc., §§ 1953e, 1953h).

 Before letters are admissible under the Business Records Act, there must be testimony as to the sources of information, the mode and time of preparation and that they were transmitted in the regular course of business. Otherwise, all written hearsay concerning business matters would be admissible regardless of reliability (*Pruett* v. *Burr,* 118 Cal.App.2d 188, 202 [257 P.2d 690]).

 The City, citing *People* v. *Tomalty,* 14 Cal.App. 224 [111 P. 513], argues that both of the above matters were admissible as public records. A similar argument was rejected in *Pruett* v. *Burr, supra,* at page 200. There, the court reversed the judgment in favor of the plaintiff in his action for damages to his cotton crop because of the erroneous admission of two letters in the files of the State Department of Agriculture, one written by a field supervisor, and one by an investigator concerning their inspection of the plaintiff's crop. The court relied on the reasoning in *City of Stockton* v. *Vote,* 76 Cal.App. 369, 396 [244 P. 609], where it was stated: "No section of the Political Code relating to the department of public works has been called to our attention that would make the report by a subordinate officer or field officer to his superior, or whatever designation may be applicable to the position occupied by Mr. Barnes, a public document admissible in evidence in controversies between independent parties. These considerations show the opinions and statements of Mr. Barnes to be mere hearsay so far as this case is concerned and wholly inadmissible."

Even assuming, *arguendo,* that the letters could be considered public records, there was no sufficient foundation for their admission. They were not shown to be originals nor certified as copies by any legal custodian nor were they the type of documents made admissible by any specific statute (*City of Los Angeles* v. *Watterson,* 8 Cal.App.2d 331 [48 P.2d 87]).

The City refers to several incidents of alleged misconduct of plaintiff's counsel in his opening statement and arguments. In some instances, the court sustained the City's objections and gave appropriate admonitions to the jury. We see nothing of sufficient significance to constitute prejudical error where the objections were not sustained. The record indicates that the entire cause was heatedly and ably argued by counsel on both sides and that the trial court commendably kept both counsel from exceeding the bounds of proper argument. We have carefully examined the court's instructions excepted to by the City and have found them to be consistent and without material error.

We need not here consider whether the trial court properly denied the City's motion for a new trial on the additional ground of newly discovered evidence as the City has made no mention of this point in its brief on the cross-appeal (*Hensley* v. *Popkin,* 75 Cal.App.2d 852, 853-856 [171 P.2d 916]; *Bellon* v. *Silver Gate Theatres, Inc.,* 4 Cal.2d 1, 17 [47 P.2d 462]). Nor is it for this court to speculate as to why the trial court granted the City's motion notwithstanding the verdict and denied its motion for a new trial rather than following the permissible procedure in granting both motions and allowing the appeal to proceed on the alternative orders (Code Civ. Proc., § 629). Our function is limited to a determination of whether either or both of the judgments in question are sustained by the evidence and the law.

The judgment notwithstanding the verdict is reversed and the judgment on the verdict is affirmed.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing was denied April 15, 1965, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied May 12, 1965.