Filed 2/15/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| EMANUELE SECCI, | B270082 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC487145) |
| v. | |
| UNITED INDEPENDENT TAXI DRIVERS, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los
Angeles County, Ralph Dau, Judge.  Reversed.

MaryBeth LippSmith, Douglas Adam Linde, and Erica
Allen Gonzales for Plaintiff and Appellant.

Law Office of Cleidin Z. Atanous, Cleidin Z. Atanous and Michelle L. Villarreal for Defendants and Respondents.

―――――――――――

Plaintiff and appellant Emanuele Secci appeals from a judgment in favor of defendants and respondents United Independent Taxi Drivers, Inc. (United Independent) and United Taxi of the Southwest (United Southwest) (collectively, United).  Secci obtained a jury verdict for damages suffered after a motorcycle crash with defendant Aram Tonakanian.[1]  Tonakanian was driving a green and white taxi marked with United's insignia.  The jury found Tonakanian to be United's agent, but not an employee.  The court granted United's motion for judgment notwithstanding the verdict (JNOV) under Code of Civil Procedure section 629, finding the evidence insufficient to support the jury's finding that Tonakanian was United's agent.  Secci now seeks reversal, arguing that there was substantial evidence of agency to support the verdict.  United contends the trial court correctly granted its JNOV motion because the only evidence supporting an agency finding were requirements imposed by public regulation or third parties.  We reverse the trial court's order and reinstate the jury's verdict, because California law does not preclude consideration of controls required by public regulations in finding an agency relationship.

―――――――――――

[1] Tonakanian is not a party to this appeal.

2

# FACTUAL AND PROCEDURAL BACKGROUND

## *Relevant facts*

We present the evidence in the light most favorable to Secci. (*Bufano v. San Francisco* (1965) 233 Cal.App.2d 61, 68 (*Bufano*).) Secci was driving his motorcycle through an intersection in the City of West Hollywood when Tonakanian's taxi, coming from the opposite direction, turned left directly in front of Secci. Tonakanian's taxi was painted with United's green and white color scheme and was licensed to pick up passengers in the City of West Hollywood.

United describes itself as an association of taxicab owners. United had franchise agreements with the City of West Hollywood and other cities in Southern California to operate a taxi service. United Southwest was a wholly-owned subsidiary of United Independent at the time. The two companies were operated by the same people, and United dispatchers worked for both companies out of the same building. United's franchise agreement with the City of West Hollywood required it to maintain commercial auto liability insurance and provide a list of insured vehicles to the director of the city's department of transportation.

Like other owner-drivers, Tonakanian owned his taxi and set his own hours. Tonakanian's contract with United stated he was an independent contractor. Drivers paid monthly dues and other fees to cover United's expenses.

United provided marketing and advertising. Each United taxi had the company's phone number painted on it. If a customer called the number, a dispatcher would enter the location information into a computer, and the computer would send out a dispatch request. In order to receive dispatch requests, a driver would check into the zone where he or she was located. Drivers were free to accept or reject dispatch requests, and could pick up passengers on the street, so long as they were licensed to accept fares within that city.

Drivers were required to use uniform credit card and dispatch equipment chosen by United. Credit card charges were initially paid to United, which would deduct credit card processing fees, monthly dues, and a small fee for accounting. Taxi rates were set by meter. Drivers were not free to charge flat or discounted rates. United required its drivers to accept vouchers and coupons that drivers could later submit to United for payment. If a driver transferred ownership of a United taxi, the buyer and seller had to notify United and pay a $500 transfer fee.

United provided a training manual to each of its drivers. It required drivers to keep a copy of the manual in the taxi and to complete a training course before taking the city's licensing test. There was conflicting testimony about whether the City of West Hollywood required United to provide training to its drivers before a driver could be licensed in that city. The training manual made reference to department of transportation rules, but also described

additional rules applicable to drivers. For example, department of transportation rules provide that drivers "shall provide prompt, efficient service and be courteous at all times to the general public, other City-permitted taxicab drivers, and to City investigators/officers" and that a driver cannot smoke while the taxicab is occupied without the consent of all passengers. The manual goes farther, stating, "Taxicab drivers are **NOT ALLOWED TO SMOKE** while servicing passenger(s)" and, "Do not discuss or argue with passengers about controversial subjects such as politics, religion, etc . . . ." The training manual provided specific information about the drivers' appearance, including a dress code, as well as specifics about driving safely, conducting themselves while waiting in taxi lines, and interacting with passengers politely.

United drivers were expected to abide by the company's rules and regulations, and drivers acknowledged their relationship with United could be terminated for violations of those rules. United had drivers working as "Road Supervisors." According to the training manual, road supervisors were trained by United, and were available to help in an emergency and to enforce United's rules and regulations. A road supervisor had authority to resolve disputes between drivers, and to cite a driver for a "false first up, guzzling, dirty cabs, not conforming to the dress code, missing hubcaps, etc . . . ." Drivers were required to complete and submit a report if they were involved in an accident, or risk a fine or suspension.

*Procedural history*

This appeal arises after Secci's claims survived two motions for summary judgment and two jury trials. Secci's original complaint named United Independent as a defendant, but not United Southwest. United Independent moved for summary judgment, but the trial court denied the motion because United Independent had not demonstrated the lack of an agency relationship. After the first trial ended with a jury verdict for Secci, the court granted United Independent's motion for a new trial on the ground that the court incorrectly denied United Independent's request to include BAJI No. 13.20, an instruction on the factors to be weighed in determining whether Tonakanian was acting as United's agent or as an independent contractor. Secci later named United Southwest as a Doe defendant and both defendants filed a second motion for summary judgment. Again, the court denied summary judgment because United's evidence did not establish the absence of an agency relationship between United and Tonakanian.

In the second jury trial, the trial court instructed the jury on how to determine whether Tonakanian was United's employee or an independent contractor, using CACI No. 3704. The court also gave instructions on the question of agency, relying on both CACI No. 3705 and BAJI No. 13.20. Under CACI No. 3705, the jury could find agency if Secci proved that United gave Tonakanian authority to act on its behalf, and that the grant of authority "may be shown by

6

words or may be implied by the parties' conduct" but could not be shown by Tonakanian's words alone. BAJI No. 13.20 gave additional details about factors the jury should consider in determining whether an agency relationship existed between United, as a principal, and Tonakanian, as an agent. The court instructed, "The most important but not the only factor, in determining whether one is an agent or independent contractor is whether the principal has the right to control the manner and means of accomplishing the result desired. Strong evidence in support of a principal agent relationship is the right to discharge at-will without cause. [¶] Other factor[s] which should be taken into consideration in determining whether a person is an agent or independent contractor are[:] [¶] (a) whether the one performing services is engaged in a distinct occupation or business[;] [¶] (b) whether, in the locality, the kind of occupation or business is one in which the work is usually done under the direction of a principal or by a specialist without supervision[;] [¶] (c) the skill required in the particular occupation or business[;] [¶] (d) whether the principal or the worker supplies the instrumentalities, tools and the place of work for the person doing the work, or helpers[;] [¶] (e) the length of time [for] which the services are to be performed[;] (f) the method of payment, whether based on time or by [the] job[;] [¶] (g) whether the work is part of the regular business of the alleged principal[;] [¶] (h) whether the parties believe they are creating a relationship of agency or independent contractor[;] and[] [¶]

7

(i) whether the alleged employee's opportunity for profit or loss depends on his or her managerial skills."

The court went on to explain, "One who contracts to act on behalf of another subject to the other's control, except with respect to his or her physical conduct, is both an agent and an independent contractor.  [¶]  One who employs an independent contractor ordinarily is not liable to others for the acts or omissions of the independent contractor."  The jury returned a verdict in favor of Secci, finding Tonakanian was not an employee, but that he was an agent.

United filed a motion for JNOV.  In its order granting JNOV, the trial court focused on whether United could be found liable under the theory of respondeat superior, as vicarious liability was only available if Tonakanian was United's employee or an agent.  The court discussed two federal cases analyzing whether taxi drivers would be considered employees in the context of the National Labor Relations Act.[2]  The court reasoned that the evidence produced at trial was more analogous to the situation in a federal case where the Ninth Circuit found no substantial evidence supported the National Labor Relations Board's finding of an employment relationship.  The trial court discounted evidence that might otherwise weigh in favor of a principal-agent relationship—such as the driver training

---

[2] The National Labor Relations Act applies to employees, and defines the term employee as not including "any individual having the status of an independent contractor . . . ."  (29 U.S.C. § 152(3).)

8

manual, required training classes, required dispatch equipment, and standardized taxi coloring—reasoning that such governmental requirements "are not 'inconsistent with an independent contractor relationship, [because] such an incorporation benefits both parties by insuring continued operation under the contract.'  (*SIDA* [*of Hawaii, Inc. v. N. L. R. B.* (9th Cir. 1975) 512 F.2d 354,] 359.)"

## DISCUSSION

Secci contends the court erroneously granted United's JNOV motion.  He argues there was substantial evidence supporting the jury's finding of agency.  United contends the question on appeal is purely legal and subject to de novo review:  whether undisputed facts establish an agency relationship where public agencies or third parties require a company to impose certain controls on its independent contractors.

We reject United's argument that we must ignore the controls required by public regulation and find that Secci presented substantial evidence of agency to support the jury's verdict.

### *Standard of Review*

"A motion for a judgment notwithstanding the verdict may properly be granted only when, disregarding conflicting evidence and indulging in every legitimate inference which

9

may be drawn from plaintiff's evidence, the result is a determination that there is no evidence sufficiently substantial to support the verdict.  On appeal, we must read the record in the light most advantageous to plaintiff, resolve all conflicts in his favor and give him the benefit of every fact pertinent to the issues involved and which may reasonably be deduced from the evidence [citation]." (*Bufano, supra*, 233 Cal.App.2d at p. 68; *I-CA Enterprises, Inc. v. Palram Americas, Inc.* (2015) 235 Cal.App.4th 257, 274.)

"'"The existence of an agency is a factual question within the province of the trier of fact whose determination may not be disturbed on appeal if supported by substantial evidence.  [Citation.]'  [Citation.]  Inferences drawn from conflicting evidence by the trier of fact are generally upheld. [Citation.]."  (*Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1576.)  "Only when the essential facts are not in conflict will an agency determination be made as a matter of law.  [Citation.]"  (*Wickham v. Southland Corp.* (1985) 168 Cal.App.3d 49, 55.)

United contends a de novo standard of review applies because the question on appeal is primarily legal.  (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.)  The legal question as framed by United is "whether controls imposed by an outside agency or third party that are passed through may constitute the control required to establish an agency relationship."  There is a legal question embedded in this appeal, but it only affects

whether we will consider externally-imposed requirements as evidence of an agency relationship between a taxi company and its drivers. Once we answer this question, the matter is subject to a substantial evidence standard of review. On appeal, "[a]s in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion. [Citations.]" (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)

## Agency[3] and vicarious liability

A corporation may be held vicariously liable as a principal for the torts of its agents. (*Meyer v. Holley* (2003) 537 U.S. 280, 285–286.) "Whether a person performing work for another is an agent or an independent contractor depends primarily upon whether the one for whom the work is done has the legal right to control the activities of the

---

[3] Although there is considerable overlap between the evidence of an employment relationship and an agency relationship, no party has argued that the jury's finding that Tonakanian was not United's employee affects whether there is substantial evidence of agency. We point this out only because the parties rely on employment and agency cases interchangeably. This approach is supported in law because many employment cases look to agency law in defining the employer-employee relationship. (See, e.g., *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350–351.)

11

alleged agent." (*Malloy v. Fong* (1951) 37 Cal.2d 356, 370.) "Actual agency typically arises by express agreement. [Citations.] . . . . [¶] "'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." [Citation.] "The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control." [Citation.]' [Citation.] Thus, the 'formation of an agency relationship is a bilateral matter. Words or conduct by both principal and agent are necessary to create the relationship . . . .' [Citation.]" (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 571.) "'In the absence of the essential characteristic of the right of control, there is no true agency . . . .' [Citations.] [¶] 'The fact that parties had a preexisting relationship is not sufficient to make one party the agent for the other . . . . [Citation.] An agency is proved by evidence that the person for whom the work was performed had the right to control the activities of the alleged agent. [Citation.]' [Citations.]" (*Id.* at p. 572.)

"[W]hether an agency relationship has been created or exists is determined by the relation of the parties as they in fact exist by agreement or acts [citation], and the primary right of control is particularly persuasive. [Citations.] Other factors may be considered to determine if an independent contractor is acting as an agent, including: whether the 'principal' and 'agent' are engaged in distinct occupations;

12

the skill required to perform the 'agent's' work; whether the 'principal' or 'agent' supplies the workplace and tools; the length of time for completion; whether the work is part of the 'principal' regular business; and whether the parties intended to create an agent/principal relationship. [Citation.]" (*APSB Bancorp v. Thornton Grant* (1994) 26 Cal.App.4th 926, 932–933.)

## Caselaw examining the legal relationship between a taxi company and its drivers

In a 1948 case remarkably similar to the one before us, this court upheld a judgment after a jury verdict in favor of a motorcyclist plaintiff against an association of taxi drivers, based on a finding that the taxi driver at fault in the accident was an agent of the association. (*Smith v. Deutsch* (1948) 89 Cal.App.2d 419 (*Smith*).) In that case, there was conflicting evidence on whether the driver was a member of the association, but the evidence did show that the association "engaged in an effort to obtain a franchise in its own name to operate taxicabs in the city of Los Angeles; it had a number of taxicabs painted in uniform colors and design and with the insignia and name of the association thereon . . . ; it advertised to the public, engaged public relations counsel; spent more than $40,000 to obtain the franchise; made substantial deposits and performance bonds therefor and had a surplus in trust in the bank; it purchased meters and obtained a commitment on approximately 200

new taxicabs." (*Smith, supra*, at pp. 421–422.) The association maintained insurance on all taxis bearing its name and insignia. The bylaws provided that members of the association were subject to expulsion on various grounds including disorderly conduct, lewd remarks, "gross dishonesty, wilful intoxication, insubordination, inefficiency or 'inability to perform the duties for which the member of this association was expressly employed to do.'" (*Id.* at p. 423.) The association had supervisors on the streets during the day and night shifts. (*Id.* at p. 422.) "Drivers were instructed how to operate; their method of dealing with customers was prescribed; before cabs were allowed to be in operation they were examined and approved; the competency and sobriety of drivers was observed and instructions were given by the association to the drivers as to the use of taxicab zones." (*Id.* at p. 423.) Weighing against an agency finding was testimony that the driver in question was not a member of the association, even though he was driving a taxi with the association's colors and insignia. The association did not tell drivers when or where to drive, but that approach was typical of the taxicab business. (*Ibid.*) The court concluded that the evidence established that the driver "was operating under the direction and control of the defendant association." (*Id.* at p. 423.) The judgment was affirmed. (*Id.* at p. 426.)

In *Yellow Cab Cooperative, Inc. v. Workers' Comp. Appeals Bd.* (1991) 226 Cal.App.3d 1288 (*Yellow Cab*), the court held a taxi driver who leased his taxi from the lessor

taxi company was an employee, not an independent contractor, for the purpose of workers' compensation law. Discussing *S. G. Borello & Sons, Inc. v. Department of Industrial Relations, supra*, 48 Cal.3d 341 (*S. G. Borello*), a seminal case for distinguishing employees from independent contractors, the *Yellow Cab* court noted, "The traditional definition of 'employment' evolved at common law to delineate the hirer's vicarious liability for the tortious acts of the person hired." (*Yellow Cab*, *supra*, 226 Cal.App.3d at pp. 1294–1295.) The court found that the taxi company exercised a sufficient level of control over its drivers to conclude that the drivers were employees, not independent contractors. The lease agreement between the driver and the company stated that the driver was self-employed, but the court found that to be non-dispositive, because the parties' actions determine the relationship, not the labels they use. (*Yellow Cab*, *supra*, at p. 1297.) Drivers were trained on how to conduct themselves, including rules of good driving behavior. The company emphasized that drivers possessed a large degree of independence, with freedom to not take radio calls or to use the cab to carry family members rather than paying passengers. The court found such freedoms were inherent in the nature of the work, because economic reality dictated that a cab driver would need to carry paying passengers during the lease time frame. In addition, the company exercised control over the drivers by prohibiting them from driving for other companies, and possessed the ability to terminate leases

15

based on write-ups or customer complaints. "Liability to discharge for disobedience or misconduct is strong evidence of control." (*Id*. at p. 1298.) The *Yellow Cab* court also rejected the argument that the lease arrangement created an entrepreneurial relationship more characteristic of an independent contractor, pointing out that drivers did not set their own rates, and there was no evidence to warrant such a finding. (*Id*. at p. 1301.) Neither *Smith* nor *Yellow Cab* contained any discussion of the argument pressed by United. In other words, those courts did not examine whether controls required by local government or third parties could be considered in deciding whether a taxi driver was the taxi company's agent.

Two Ninth Circuit Court of Appeals opinions have analyzed whether a taxi driver was an employee of a taxi company, in the context of determining whether the National Labor Relations Act applied. (*N. L. R. B. v. Friendly Cab Co., Inc.* (9th Cir. 2008) 512 F.3d 1090 (*Friendly*) and *SIDA of Hawaii, Inc. v. N. L. R. B.* (9th Cir. 1975) 512 F.2d 354, (*SIDA*).) In *SIDA*, the Ninth Circuit found there was *not* substantial evidence to support the National Labor Relations Board's finding of an employer-employee relationship between SIDA, an association of taxi owner-operators, and its members. (*SIDA*, at p. 357.) Applying common law principles of agency to the facts before it, and noting that the "essential ingredient of the agency test is the extent of control exercised by the 'employer,'" the court found that SIDA did not exercise sufficient control over

16

its members to be considered an employer. SIDA had a skeleton corporate structure, and one of the key reasons for its existence was its exclusive contract with the State of Hawaii to provide taxi service at the airport. Drivers were free to choose their hours, to work for other taxi companies, and to make their own arrangements with clients. Fare amounts were set by local ordinance, not by SIDA, and drivers collected and kept their own fares. SIDA kept no income records for its member drivers, and drivers paid for their own insurance. The Ninth Circuit rejected the Board's reliance on those rules and regulations as evidence of SIDA's control over its drivers, finding them to be "standards of conduct to which all of the drivers should adhere in order to promote the SIDA image for the mutual benefit of [SIDA] and its drivers." (*Id.* at pp. 358–359.) SIDA's rules and regulations required drivers to display SIDA identification, follow dispatcher instructions, and be neat and courteous. The Ninth Circuit reasoned that when contractual or regulatory requirements benefit both the association and the drivers, such requirements were not inconsistent with an independent contractor relationship. (*Id.* at p. 359.)

On different facts, the Ninth Circuit affirmed the Board's finding of an employer-employee relationship based on evidence of control exercised by the Friendly Cab Company. (*Friendly, supra*, 512 F.3d at p. 1093.) In that case, the company leased taxis to its drivers at a weekly rate that varied based on the type of vehicle and the driver's history, and the company retained discretion to decide what

17

type of vehicle a driver would receive. Although the leases stated no employer-employee relationship was being created, drivers agreed to comply with requirements set forth in the company's policy manual and its standard operating procedures, including safety requirements, a dress code, and a prohibition against drivers using personal business cards. (*Id*. at pp. 1093–1094.) Drivers could not solicit customers independently, and were prohibited from using personal cell phones while driving for any reason, including accepting calls for service. (*Id*. at p. 1098.) In addition, the company would sometimes dispatch drivers to provide voucher service, where the passenger would pay using a voucher that the driver must redeem through the company, and the company retained a portion of the voucher amount. Drivers could not refuse vouchers, but sometimes received less than the metered rate for those trips. (*Id*. at p. 1094.) Drivers were required to attend annual classes on company policies and laws concerning discrimination, and the Ninth Circuit observed that the Board "reasonably found that Friendly's training requirements exceed those required by [municipal] ordinance and constitute some degree of control over the drivers." (*Friendly*, at p. 1101.)

***California law does not require the trial court to ignore evidence of control when United claimed that its policies were based on local regulations.***

United urges this court to follow the approach taken by the trial court, arguing that as a matter of law, when a taxi company exercises control over its drivers in order to comply with public regulations or third party requirements, such activity cannot be considered in determining whether an agency or employment relationship exists. United argues that *SIDA* and *Friendly* permit courts to ignore any requirements imposed upon taxi drivers derived from government-imposed requirements or regulations. United attempts to bolster its argument with additional federal cases, most of which cite back to *SIDA* for the proposition that rules enforced for the mutual benefit of the taxi company and its drivers are not a relevant consideration in determining whether an individual is an employee, rather than an independent contractor. (E.g., *Chase v. Trustees of W. Con. of T. Pension T.F.* (9th Cir. 1985) 753 F.2d 744, 751 [no employment relationship where company directors have authority to make and enforce rules concerning the personal conduct of the drivers and power to supervise the vehicles]; *Local 777, Democratic U. Organizing Com. v. N. L. R. B.* (D.C. Cir. 1978) 603 F.2d 862, 876 ["to the extent that municipal ordinances prescribe the conduct of lessee drivers they are regulated by law, not supervised or controlled by" the taxi company].)

19

United's argument relies exclusively on federal cases.[4] United does not point to any California law permitting courts to ignore controls imposed by an employer or a principal solely because the controls are rooted in such government regulations, nor are we aware of any California law to that effect. In addition, United's argument does not address the fact that California law recognizes that an individual hired as an independent contractor may be an agent. "'Agency and independent contractorship are not *necessarily* mutually exclusive legal categories as independent contractor and servant or employee are. In other words, an agent may also be an independent contractor. [Citation.]'" (*Jackson v. AEG Live, LLC* (2015) 233 Cal.App.4th 1156, 1184.)

Based on our analysis of California law governing vicarious liability for an independent contractor's negligence, we reject the federal cases United relies upon. We instead conclude that public regulation of an industry does not, as a matter of law, shield a party from vicarious liability when it hires independent contractors, rather than employees.

---

[4] Because we found no state cases analyzing whether the federal approach would apply under California law, we invited the parties to submit additional briefing addressing the applicability of both *Smith, supra,* 89 Cal.App.2d 419, where the court found a driver to be an agent of the taxi association, and *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, which discussed the regulated hirer exception imposing vicarious liability on publicly regulated companies that hire independent contractors.

A company is generally not liable for the negligent acts of its independent contractors, subject to a growing body of exceptions to that general rule. (See, e.g., *Privette v. Superior Court* (1993) 5 Cal.4th 689, 693 (*Privette*) [general common law rule of non-liability for negligence of an independent contractor is subject to exceptions so numerous as to render the rule a mere preface to the inventory of its exceptions]; *Kinney v. CSB Construction, Inc.* (2001) 87 Cal.App.4th 28, 32 [same].) A company that hires an independent contractor can be held liable to third parties under the doctrine of peculiar risk (see *Privette, supra*, 5 Cal.4th at pp. 695–698 [reviewing history and evolution of peculiar risk doctrine]), the non-delegable duty exception (see *SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 596), and the regulated hirer exception (*Eli v. Murphy* (1952) 39 Cal.2d 598 (*Eli*); *Vargas v. FMI, Inc.* (2015) 233 Cal.App.4th 638, 644 (*Vargas*) [trucking company regulated by the department of transportation and state law cannot delegate its responsibility to the public by characterizing its drivers as independent contractors]). The regulated hirer exception to the general rule of non-liability for an independent contractor's negligence is most pertinent to this case, as United grounds its defense of the trial court's order granting JNOV on the premise that government regulation and municipal franchise requirements immunize it from being held liable under an agency theory of vicarious liability. United's argument runs counter to the policies behind the regulated hirer exception.

21

In *Millsap v. Federal Express Corp., supra*, 227 Cal.App.3d 425, 433–435 (*Millsap*), the court of appeal discussed the regulated hirer exception to the general rule of non-liability, pointing out that the hirer of an independent contractor may be held liable when "'an individual or corporation undertakes to carry on an activity involving possible danger to the public under a license or franchise granted by public authority subject to certain obligations or liabilities imposed by the public authority . . . .'" (*Id.* at p. 434, quoting *Taylor v. Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 604 (*Taylor*).) As the California Supreme Court has explained, "The effectiveness of safety regulations is necessarily impaired if a carrier conducts its business by engaging independent contractors over whom it exercises no control. If by the same device it could escape liability for the negligent conduct of its contractors, not only would the incentive for careful supervision of its business be reduced, but members of the public who are injured would be deprived of the financial responsibility of those who had been granted the privilege of conducting their business over the public highways. Accordingly, both to protect the public from financially irresponsible contractors, and to strengthen safety regulations, it is necessary to treat the carrier's duties as nondelegable." (*Eli, supra*, 39 Cal.2d at p. 600.)

United argues that when public regulations require a company to exert control over its independent contractors, evidence of that government-mandated control cannot support a finding of vicarious liability based on agency. This

22

argument conflicts with the policy behind the regulated hirer exception, which emphasizes that the effectiveness of public regulations "would be impaired if the carrier could circumvent them by having the regulated operations conducted by an independent contractor." (*Millsap, supra*, 227 Cal.App.3d at p. 434.)

United acknowledges that the regulated hirer exception applies to entities engaged in activities involving enhanced risk to the public.  United argues that in contrast to the danger posed in those cases, the controls imposed on the taxi industry are "quality of life" regulations, affecting public convenience, not public safety.  Because the regulated hirer exception to the general rule of non-liability only applies to activities that involve an increased risk of danger to the public, they argue it would not—or should not—apply. We disagree.

Public regulations require taxi companies to impose controls upon their drivers for the sake of public safety. They are a valid exercise of police power.  "The regulation of the taxicab industry is a traditional subject of the police power of cities and counties.  [Citations.]  [¶]  Local authorities act pursuant to their police power in regulating virtually all aspects of the taxicab business, including who may operate a cab, how many cabs may be operated, how much cabs may charge, where cabs may travel, and where cabs may pick up passengers.  [Citations.]" (*Cotta v. City and County of San Francisco* (2007) 157 Cal.App.4th 1550, 1560.)  The Government Code directs municipalities to

regulate taxi service, providing that "every city or county shall protect the public health, safety, and welfare by adopting an ordinance or resolution in regard to taxicab transportation service . . . ." (Gov. Code, § 53075.5, subd. (a).) Cities rely on franchisees to exercise sufficient control over taxi drivers to remain in compliance with regulations intended to protect the public. If a franchisee taxi company were to decline to carry out its obligations under the franchise agreement, it would place itself at risk of losing its franchise with the city. The fact that the state and local municipalities impose public regulations upon the taxi industry reflects the same policy considerations that led California courts to hold common carriers vicariously liable for their independent contractor drivers in other regulated hirer cases. (See, e.g., *Eli v. Murphy, supra*, 39 Cal.2d at pp. 599–600; *Taylor v. Oakland Scavenger Co., supra*, 17 Cal.2d at p. 604; *Vargas v. FMI, Inc., supra*, 233 Cal.App.4th at p. 644.) While driving a taxi is not as potentially dangerous as transporting hazardous materials or driving a large vehicle on public highways, the regulations are a matter of public safety. To the extent the regulations require taxi companies to exercise a significant level of control over their drivers, they do not, as a matter of law, preclude holding the companies vicariously liable for the negligence of the drivers under their control.

In the absence of any California case law to the contrary, and in light of the decision in *Smith, supra*, 89 Cal.App.2d 419, holding a taxi association liable even when

24

it was not publicly regulated, we choose to depart from the line of federal cases United relies upon. The fact that many of the controls imposed by the taxi association on its drivers are based on governmental rules and requirements or operate for the mutual benefit of the taxi company and its drivers does not give courts or factfinders license to ignore those controls in deciding whether a principal-agent relationship exists. Once we have established that the status of the taxi industry as a publicly regulated industry may expose taxi companies to vicarious liability for the negligent acts of drivers who act as the companies' agents, it would be illogical to exclude from consideration the controls required by such regulations.

### *The jury's agency finding was supported by substantial evidence*

Because the test for agency is a multi-factored test, and there was substantial evidence that United controlled significant aspects of its drivers' work, we cannot say that there was insufficient evidence as a matter of law to support the jury finding of agency. United retained the authority to terminate its relationship with any of its drivers, as well as the ability to fine or discipline them for violating United's rules and regulations. United supplied each driver a training manual with detailed rules of conduct. Drivers were required to participate in training and to use equipment purchased by United. According to the training

manual, drivers were trained and deployed by United as road supervisors to assist in emergencies and enforce the company's rules and regulations. Viewed in the light most favorable to Secci, the evidence presented at trial was sufficient to support a jury finding that Tonakanian was United's agent and United was vicariously liable for Tonakanian's acts. The court's order granting JNOV was in error.

## DISPOSITION

The judgment is reversed. Costs on appeal are awarded to Secci.


KRIEGLER, J.


We concur:


TURNER, P.J.


KIN, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.